# 25-2837-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ESTATE OF O.S.T, BY HEIR-AT-LAW GAD KADEM, TALIA BINER, ESTHER BINER, GAD KEDEM, INDIVIDUALLY, REUMA KEDEM, GIDEON HEIMAN GLATT, ODIN ELIAZ, INDIVIDUALLY, YASMIN BEN GIGI, YIFAT TANAMI, MAAYAN ELIAZ, INDIVIDUALLY, DAFNA SHAY HEIMAN, DOV ELIAZ, STAV ARAVA ELIAZ, INDIVIDUALLY, DITZA HEIMAN, SAGI ARAVA, ESTATE OF T.E., MINOR CHILD, BY HEIR-AT-LAW MAAYAN ELIAZ, NETA HEIMAN MINA, ESTATE OF DIKLA ARAVA ELIAZ, BY HEIR-AT-LAW ODIN ELIAZ AND STAV ELIAZ,

*(Caption Continued on the Reverse)*

*On Appeal from the United States District Court for the Southern District of New York*

## BRIEF WITH SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

Gavriel Mairone
Managing Partner
MM-LAW LLC
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
312-253-7444

Bijan Amini
Avery D. Samet
John W. Brewer
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
212-490-4700

*Attorneys for Plaintiff-Appellant*

PHP (212) 719-0990
appeals@phpny.com

YALI KOPERSTEIN, ZIV KOPERSTEIN, ALON ARAVA, HADAR BEN DAVID, NAAMA KOPERSTEIN, LIAT KOPERSTEIN, RAN AHARON AVNI, GONI KOPERSTEIN AVNI, SIGAL BENBENISTE, MERAV TAL (TAL ALFASI), SIGALIT SHARABI, RACHEL ALFENDRI, MAAYAN ZIN, INDIVIDUALLY, D. E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, SOFIA HODEDATOV, TOMER TAL ALFASI, E. E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, GALINA RAHMILOV, INDIVIDUALLY, VIKTOR RAHMILOV, KEREN BLANK, ORI TAL ALFASI, HANANEL BENBENISTE, ESTATE OF MOSHE SHUVA, BY HEIR-AT-LAW YOSSEF SHUVA, EFIM SOLOMONOV, NATALI RAHMILOV, E. L. R., MINOR CHILD, BY LEGAL GUARDIAN GALINA RAHMILOV, MAAYAN DEVIKO, SONIA SHUVA, YOSSEF SHUVA, INDIVIDUALLY, SHIMON SHUVA, MORAN KAPLUN (TARASOV), INDIVIDUALLY, ORIT BAR-ON, INDIVIDUALLY, ESTATE OF DROR KAPLUN, BY HEIRS-AT-LAW NOAM KAPLUN, MAAYAN KAPLUN KEIDER, MORAN KAPLIN (TARASOV), ESTATE OF MARCEL FRAILICH, BY HEIRS-AT-LAW MOR FRIDA STRIKOVSKI, ZIV FRAILICH, AMIT FRAILICH, MAAYAN KAPLUN KEIDAR, INDIVIDUALLY, NOAM KAPLUN, INDIVIDUALLY, TAMIR HODEDATOV, ESTATE OF YUVAL BAR-ON, BY HEIRS-AT-LAW ORIT BAR-ON AND ITZHAK BAR-ON, ITZHAK BAR-ON, INDIVIDUALLY, SHARON CASPI, ESTATE OF VARDA HARAMATY, BY HEIR-AT-LAW AYELET HARAMATI MIZRAHI, AMIT CASPI, INDIVIDUALLY, MOR FRIDA STRIKOVSKI, INDIVIDUALLY, ZIV FRAILICH, INDIVIDUALLY, GAT VAGE, ITAMAR MIZRAHI, AVRAHAM MIZRAHI, AYELET HARAMATI MIZRAHI, INDIVIDUALLY, TOMER MIZRAHI, MAY CASPI, DOR MICHAEL SABAG, EDITH HYAMS, DANNY OFER VAGE, INDIVIDUALLY, MICHAL SABAG, H. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, ASHER SABAG, AMIT FRAILICH, INDIVIDUALLY, NIV CASPI, S. C., MINOR CHILD, BY LEGAL GUARDIAN AMIT CASPI, IGOR SHINDEL, ESTATE OF GAYA HALIFA, BY HEIR-AT-LAW AVRAHAM HALIFA, GUY SHINDEL, S. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, ESTATE OF MARK SHINDEL, BY HEIR-AT-LAW JULIA SHINDEL, NOGA HALIFA, SIGAL HALIFA, AVRAHAM HALIFA, INDIVIDUALLY, IDO HALIFA, ESTATE OF YUVAL SALOMON, BY HEIR-AT-LAW DORON SALOMON, NITZAN LAHAV-PASTER, IRIT LAHAV, YAARA SZATMARI, ELIYAHU HANAN BUCH, TAMAR LAHAV, JULIA SHINDEL, INDIVIDUALLY, B. S., MINOR CHILD, BY LEGAL GUARDIAN JULIA SHINDEL, DORON SALOMON, INDIVIDUALLY, R. L., MINOR CHILD, BY LEGAL GUARDIAN GALIT LAHAV, OMER LAHAV, ILAN LAHAV, GALIT LAHAV, INDIVIDUALLY, GUI LAHAV,

*Plaintiffs-Appellants,*

*v.*

UNITED NATIONS RELIEF AND WORKS AGENCY (UNRWA), PHILLIPE LAZZARINI, PIERRE KRAHENBUHL, FILIPPO GRANDI, LENI STENSETH, SANDRA MITCHELL, GRETA GUNNARSDOTTIR, MARGOT ELLIS,

*Defendants-Appellees.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ III
JURISDICTIONAL STATEMENT ........ 1
QUESTIONS PRESENTED ........ 2
STATEMENT OF THE CASE ........ 3

I. The Complaint's Allegations ........ 4
 A. The Defendants' Wrongful Acts ........ 4
 B. The Plaintiffs' Injuries ........ 7

II. Procedural History ........ 8

III. The CPIUN and Its Ratification ........ 11
 A. The Provisions of the CPIUN ........ 11
 B. The Legal and Historical Background to CPIUN Ratification ........ 12

IV. UNRWA's Role Within the UN System ........ 16
 A. UNRWA's Independent Operations ........ 16
 B. The UN and the UN System ........ 18
 C. Facts Concerning Whether UNRWA is a Subsidiary Organ ........ 19

SUMMARY OF ARGUMENT ........ 22
ARGUMENT ........ 26

I. THE DISTRICT COURT WRONGLY PUT THE BURDEN ON PLAINTIFFS TO NEGATE DEFENDANTS' CLAIMS OF IMMUNITY ........ 27

II. NONE OF THE DEFENDANTS ARE WITHIN THE SCOPE OF ANY IMMUNITY PROVIDED BY THE CPIUN ........ 31
 A. The CPIUN's Text Does Not Expressly Extend Immunity to Any Entities Beyond the UN Itself, and Its Section 11 Has No Relevance to this Case ........ 31

B. The "United Nations" Itself Is Given Immunity in Section 2 of the CPIUN, But UNWRA Is Not "the United Nations" .......... 33

1. Defendants' Proposed Interpretation of Section 2 Is Grossly Overbroad .......... 34

2. UNRWA Is Not Covered by Section 2 Because Its Activities, Governance, and Funding Are All Distinct from the United Nations Itself .......... 47

C. "Officials of the United Nations" Are Given Limited Immunity By Section 18, But the Individual Defendants Are Not Officials "of the United Nations" .......... 51

D. Under-Secretary-Generals of the UN are Given Additional Immunity by Section 19 of the CPIUN, But Neither Lazzarini nor Grandi Is or Was an Under-Secretary-General .......... 52

III. ANY PROTECTION PROVIDED BY THE CPIUN TO ANY OF THESE DEFENDANTS WOULD NOT PROVIDE IMMUNITY FOR AIDING AND ABETTING GENOCIDE AND OTHER JUS COGENS VIOLATIONS .......... 56

A. Section 18 of the CPIUN Does Not Provide Individual "Official Acts" Immunity for Jus Cogens Violations, Because They Are Ultra Vires .......... 59

B. Section 19 of the CPIUN Does Not Provide Individual Immunity for Jus Cogens Violations, Because They Are Ultra Vires .......... 63

C. Well-established Rules of Treaty Interpretation Show That the CPIUN Does Not Confer Impunity for Violations of Jus Cogens Norms on Any of the Defendants .......... 64

IV. IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY TO TEST THE FACTUAL GROUNDS FOR DEFENDANTS' CLAIMED STATUS .......... 68

CONCLUSION .......... 70

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.J. Ruiz Consultatoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*,
2024 WL 460482 (Bankr. S.D.N.Y. Feb. 6, 2024) ................................28

*Broidy Capital Mgt. LLC v. Benomar*,
944 F.3d 436 (2d Cir. 2019) ...........................................................26, 64

*Brzak v. United Nations*,
597 F.3d 107 (2d Cir. 2010) ...........................................................44, 56

*Carpenter v. Republic of Chile*,
610 F.3d 776 (2d Cir. 2010) ................................................................66

*Coale v. Society Co-Operative Suisse de Charbons, Basle*,
21 F.2d 180 (S.D.N.Y. 1921) ...........................................................36-37

*Diggs v. Schultz*,
470 F.2d 461 (D.C. Cir. 1972) ...............................................................35

*Filartega v. Pena-Irala*,
630 F.2d 876 (2d Cir. 1980) ................................................................58

*Filus v. Lot Polish Airlines*,
907 F.2d 1328 (2d Cir. 1990) ...........................................................69-70

*Flores v. S. Peru Copper Corp*.,
414 F.3d 233 (2d Cir. 2003) ................................................................67

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*,
841 F.3d 133 (2d Cir. 2016) ................................................................43

*Funk v. Belneftekhim*,
861 F.3d 354 (2d Cir. 2017) ................................................................69

*Georges v United Nations*,
834 F.3d 88 (2d Cir. 2016) ......................................................34, 42, 43

*Hennessey v. Univ. of Kansas Hosp. Auth.*,
53 F.4th 516 (10th Cir. 2022) ........................................................28, 49

*In re Estate of Marcos Human Rights Litig.*,
25 F.3d 1467 (9th Cir. 1994)...........................................................58-59

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp.2d 765 (S.D.N.Y. 2005)..........................................70

*Jam v. Int'l Finance Corp.*,
586 U.S. 199 (2019) ..........................................................................36

*Jesner v. Arab Bank, PLC*,
584 U.S.  241 (2018) ..........................................................................59

*Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*,
186 F.3d 210 (2d Cir. 1999) ...............................................................26

*Kashef v. BNP Paribas, S.A.*,
316 F. Supp. 3d 770 (S.D.N.Y. 2018)..................................................60

*Kashef v. BNP Paribas, S.A.*,
925 F.3d 53 (2d Cir. 2019) ...........................................................57, 61

*Leitner v. Westchester Community College*,
779 F.3d 130 (2d Cir. 2015) .....................................................37, 49-50

*Mancuso v. New York State Thruway Authority*,
86 F.3d 289 (2d Cir. 1996) ...........................................................37, 50

*Mazengo v. Mzengi*,
542 F. Supp.2d 96 (D.D.C. 2008) .........................................................28

*Medillin v. Texas*,
552 U.S. 491 .......................................................................................35

*Mora v. New York*,
524 F.3d 183 (2d Cir. 2008) ....................................................................65

*Ocean Line Holdings Ltd. v. China National Chartering Corp.*,
578 F.Supp.2d 621 (S.D.N.Y. 2008).......................................................27

*Pablo Star Ltd. v. Welsh Government*,
961 F.3d 555 (2d Cir. 2020) ....................................................27, 29-30

*Peterson v. Islamic Republic of Iran*,
758 F.3d 185 (2d Cir. 2014) ....................................................................35

*Rodriguez v. Pan American Health Organization*,
29 F.4th 706 (D.C. Cir. 2022) ............................................................46-47

*Sacirby v. Guccione*,
589 F.3d 52 (2d Cir. 2009) ......................................................................34

*Samantar v. Yousuf*,
560 U.S. 305 (2010)..................................................................................62

*Shamsee v. Shamsee*,
74 A.D.2d 357 (2d Dep't 1980)...........................................................50-51

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
101 F.3d 239 (2d Cir. 1996) ....................................................................66

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)..................................................................................58

*Swarna v. Al-Awadi*,
622 F.3d 122 (2d Cir. 2010) ....................................................................26

*Tachiona v. United States*,
386 F.3d 205 (2d Cir. 2004) ....................................................................64

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023) ........................................ 29

*Ulen & Co. v. Bank Gospodarstwa Krajowego*,
261 A.D. 1 (2d Dep't 1940) ........................................ 36

*United States v. Deutsches Kalisyndikat Gesellschaft*,
31 F.2d 199 (S.D.N.Y. 1929) ........................................ 36

*Wiwa v. Shell Petroleum Development Co. of Nigeria*,
335 Fed. App'x 81 (2d Cir. 2009) ........................................ 26

*Yousuf v. Samantar*,
699 F.3d 763 (4th Cir. 2012) ........................................ 61-62

**Statutes**

8 U.S.C. §1189 ........................................ 6

28 U.S.C. §1291 ........................................ 1

28 U.S.C. §1331 ........................................ 1, 29

28 U.S.C. §1367 ........................................ 1, 29

28 U.S.C. §1603 ........................................ 36

28 USC §1605 ........................................ 37

Alien Tort Statute
28 U.S.C. §1350 ........................................ 1, 3, 29

Foreign Sovereign Immunity Act,
28 U.S.C. §§1602 *et seq.* ........................................ *passim*

International Organizations Immunity Act,
22 U.S.C. §§288 et seq. ........................................ *passim*

Pub. L. 102-256 .......... 3

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 4, 9

**Other Authorities**

Convention on the Privileges and Immunities of the United Nations,
21 U.S.T. 1418 (1970) .......... *passim*

Ex. Ord. 9698 (Feb. 19, 1946) .......... 14

Ex. Ord. No. 10864 (Feb. 18, 1960) .......... 15

Ex. Ord. No. 12628 (Mar. 8, 1988) .......... 15

H.R. Rep. No. 1203 .......... 12-13

Restatement (3d) of Foreign Relations Law of the United States 102 .. 65

Vienna Convention on Diplomatic Relations,
Apr. 18, 1961, 23 U.S.T. 3227 .......... 64, 65

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. §§1331, 1350, and 1367(a). The District Court's September 30, 2025, opinion (the "Dismissal Decision"), included in the Special Appendix annexed hereto at SPA23 and related judgment dismissing the action dated the same day (A971) was a final decision.[1] This Court has appellate jurisdiction under 28 U.S.C. §1291. The notice of appeal was timely because filed on October 29, 2025 (A974), less than 30 days after entry of the Dismissal Decision and judgment.

[1] Pages of the Special Appendix are cited as SPA_ and pages of the other Appendix as A_.

## QUESTIONS PRESENTED

1. Whether Defendant the United Nations Relief and Works Agency ("UNRWA") is "the United Nations" under the treaty known as the Convention on the Privileges and Immunities of the United Nations ("CPIUN") and thus immune from all liability in U.S. Courts?

2. Whether the Individual Defendants who are current or former UNRWA officials are officials "of the United Nations" protected by Sections 18 and/or 19 of the CPIUN?

3. Whether the CPIUN should be interpreted to immunize actions in violation of the preemptory norms of international law (jus cogens)?

4. Whether the District Court wrongly placed the burden on Plaintiffs to negate Defendants' claim of immunity?

5. Whether in the alternative the District Court should have ordered jurisdictional discovery into the alleged factual bases for Defendants' immunity claims?

## STATEMENT OF THE CASE

This is an action for monetary damages brought by victims of the Hamas terror attack of October 7, 2023 (the "October 7 Attack"), against Defendants who directly provided the monetary and military assistance to Hamas necessary to perpetrate that attack.

The Plaintiffs are not citizens of the United States and accordingly bring their claims for torts committed in violation of the law of nations and treaties of the United States under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), Torture Victims Protection Act ("TVPA"), Pub. L. 102-256, other torts and statutory violations arising under non-federal law. A212-219.[2]

The Defendants are the United Nations Relief and Works Agency ("UNRWA"), six of its former senior officials and one still-current official. The individual Defendants are Phillipe Lazzarini, UNRWA's current Commissioner-General; Pierre Krähenbühl and Filippo Grandi, both former UNRWA Commissioner-Generals; Leni Stenseth, Sandra

---

[2] A companion case currently pending in the S.D.N.Y. against the same Defendants for similar wrongdoing (*Atzili et al. v. UNRWA et al.*, No. 25-cv-05677) includes numerous U.S. citizen Plaintiffs with standing to bring civil claims under the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.

Mitchell, and Margo Ellis, all former UNRWA Deputy Commissioner-Generals; and Greta Gunnarsdottir, the now-former head of UNRWA's New York operations (collectively, the "Individual Defendants"). A159-160.

The District Court, by the Honorable Analisa Torres, U.S.D.J, granted Defendants" motion to dismiss the Complaint under Rule 12(b)(1) due to Defendants' claimed immunity under the CPIUN. SPA50. Plaintiffs appeal from the Dismissal Decision and related judgment. A974. The Dismissal Decision is unreported.

## I. The Complaint's Allegations

### A. The Defendants' Wrongful Acts

Plaintiffs allege that the Defendants aided and abetted the October 7 Attack by intentionally providing Hamas with the material assistance necessary to perpetrate it. UNRWA was supposed to be a humanitarian organization, but under the leadership of the Individual Defendants, it knowingly provided Hamas with safe havens to plan and launch the attack, currency to buy weapons, and indoctrination and recruitment of new members.

Defendants facilitated the construction of Hamas command centers, attack tunnels and staging bunkers within UNRWA's facilities

so that Hamas could plan and launch the October 7 Attack from safe havens A170-176. Defendants provided Hamas with hundreds of millions of U.S. dollars in cash, so that Hamas could purchase weaponry on the black market for the attack. A189-191. Defendants turned their educational facilities over to Hamas indoctrination despite the objections of the United States, and international bodies. A192-203.

It is difficult to overstate the extent of Defendants' specific provision of support to Hamas. For example, Defendants facilitated the construction of Hamas' war room for planning the attack directly underneath UNRWA's Gaza Headquarters, with power cables for internet and electricity running through UNRWA's server room. A170-171. Defendants made sure to pay its Gaza employees with U.S. dollars in cash, even though such dollars were useless to its Gaza employees, but extremely useful to Hamas. A189-191. Those employees predictably had to go to Hamas-affiliated money-changers in order to covert the dollars into local currency, thereby providing Hamas with the cash dollars necessary for the smugglers from which Hamas was obtaining weaponry. A189-190. Hamas was otherwise prevented by obtaining U.S. cash dollars. A191.

Defendants provided this support with full knowledge of Hamas and its goals and actions. For years, Hamas had publicly and repeatedly pronounced its desire to massacre Jews in a genocidal war of ethnic cleansing. A161-162. For this reason, and for Hamas' actual terrorist acts consistent with this goal, the United States designated Hamas as a Specially Designated Terrorist Organization in 1995 under E.O. 12947, a Foreign Terrorist Organization in 1997 by the Secretary of State pursuant to 8 U.S.C. §1189, and a Specially Designated Global Terrorist Group in 2001 under E.O. 13224. A163. The United States also designated Hamas' leaders and fundraisers as Specially Designated Nationals. *Ibid*. These designations remained in place through multiple administrations of both parties. None of these designations stopped the Defendants from directly supporting Hamas.

Finally, the Complaint alleges how the Defendants took these actions in large part from New York City. Because UNRWA is not funded by the UN's general revenues, each year it raises its own money from donors through pledging conferences in Manhattan. UNRWA collects and maintains its funds in a Manhattan JP Morgan account, and its New York staff distributes funds throughout the year according

to UNRWA's policy-based budgets. A190-191, 204, 208. Each of the Individual Defendants not based in Manhattan physically traveled to New York and engaged in acts within the Southern District giving rise to liability. A204-207.

### B. The Plaintiffs' Injuries

The Plaintiffs are 101 victims of the October 7 Attack or, in 12 cases, the estates of murdered victims of that attack. The living Plaintiffs were variously wounded, raped, taken hostage by Hamas to Gaza, or otherwise injured as part of Hamas' genocidal attack. Each Plaintiff's individual circumstances and individual injuries from the attack varied, and the Complaint sets forth each Plaintiff's individual story at length. A64-158.

The common denominator among these accounts is that, true to its stated goals, Hamas systematically hunted down their civilian victims in their homes and neighborhoods. In many cases, Hamas attackers went house-to-house in order to exterminate entire families. The deceased victim whose estate is the lead Plaintiff, Tamar Kedem Siman Tov, was murdered with her husband, her two twin five-year old daughters and her two-year old son, after Hamas gunmen broke down

their saferoom door. A64-69. The family's saferoom was the children's bedroom. A67-68. These dozens of victim accounts are foreseeable fruits of Defendants' direct provision of support to Hamas.

## II. Procedural History

On June 26, 2024, two days after this action was commenced, an in-house lawyer at the UN wrote to the US Ambassador to the UN asserting that all of the Defendants were immune under the CPIUN and requesting that "appropriate action" be taken with regard to the lawsuit. A229. The UN lawyer claimed that UNRWA was protected by the CPIUN as "an integral part" of the UN, but provided no further support for that proposition. A230.

On July 30, 2024, the Department of Justice (the "Government") filed a letter in this action attaching the UN's letter and seeking dismissal of this action based upon the immunity asserted therein. A221. Plaintiffs responded that, among other things, (i) UNRWA could not be considered the "United Nations" under the CPIUN and thus that none of the Individual Defendants were "officers of the United Nations" covered by the CPIUN; and (ii) that even if the CPIUN did apply to any of these Defendants, its immunity could not extend to violations of jus

cogens norms, the fundamental preemptory norms of international law.[3] After the Government clarified that it took no position on whether most of the Individual Defendants were entitled to immunity (A716), the District Court ordered the served Individual Defendants to appear. A720. Subsequently, all Defendants filed a motion to dismiss under Rule 12(b)(1), limited to their asserted immunity under the CPIUN and the International Organizations Immunity Act, 22 U.S.C. §§288 et seq. ("IOIA"). A733.

After Defendants' motion was fully briefed, the Government advised the Court that it was reconsidering its previous positions. A843. On April 24, 2025, the Government filed a letter stating that after fuller consideration of the relevant law and facts it had concluded that UNRWA and the Individual Defendants (with one possible exception) were not immune under either the CPIUN or the IOIA and that the case should proceed to give Plaintiffs the opportunity to prove the allegations in the Complaint. A845-854. The District Court then permitted the parties to make supplemental submissions responding to

[3] In the alternative, Plaintiffs sought discovery into the facts underlying Defendants' claims of immunity. A663-664, A818-819.

the Government's new submission. A855-942. Over the course of multiple rounds of briefing, the parties submitted numerous documents to the Court regarding UNRWA's asserted status and immunity. On September 30, 2025, the District Court issued the Dismissal Decision, ruling that Defendants were immune under the CPIUN, even for violations of jus cogens norms, and declining to address whether Defendants were immune under the IOIA.

The Dismissal Decision ruled that section 11 of the CPIUN expressly granted immunity to "subsidiary organs" of the UN. SPA38. It them concluded that Plaintiffs bore the burden to prove that UNRWA was not such a "subsidiary organ." SPA32. The district court concluded, based on the materials presented, that Plaintiffs had not met that burden. SPA32-38. The district court ruled that UNRWA's immunity extended even to violations of jus cogens norms, such as genocide, and ruled that the Individual Defendants were similarly immune under the CPIUN's sections 18 (UN officials) and 19 (UN assistant-secretaries-general). SPA43-50. The lower court denied Plaintiffs alternative request for discovery into the above topics. SPA50.

## III. The CPIUN and Its Ratification

### A. The Provisions of the CPIUN

The CPIUN contains eight articles, covering a wide range of subjects, and immunity from liability, either civil or criminal, is not the treaty's primary topic. SPA11.

Article 1, section 1 states that "The United Nations shall possess juridical personality" and that the UN can contract, acquire property and sue in its own name. The treaty contains no section clarifying the term "United Nations." Article 2, section 2 provides that the UN itself and its own property and assets ("wherever located and by whomsoever held") are immune from any legal process, absent waiver.

Article IV concerns the "Representatives of Members." Section 11 (on which the District Court relied) states that Representatives of Members to the principal and subsidiary organs of the UN, and to UN conferences, shall "while exercising their functions and during the journey to and from the place of meeting," enjoy a number of privileges, such as immunity from personal arrest, inviolability for papers, right to use codes, exemption from immigration, baggage rights and other rights consistent with diplomatic envoys, including "immunity from legal process of every kind." Section 12 provides immunity to such

representatives to ensure their complete freedom of speech in the discharge of their duties. Section 14 makes clear that privileges and immunities of such representatives of Members are subject to waiver by the Members themselves. *Id.*

Article V governs the UN's "Officials." Section 18 provides immunity to specified officials for "all acts performed by them in their official capacity." Section 19 provides immunity for the Secretary General and all Assistant Secretary Generals the immunity accorded to diplomatic envoys "in accordance with international law."

### B. The Legal and Historical Background to CPIUN Ratification

Prior to World War 2, U.S. law recognized sovereign immunity for foreign governments, but did not provide for immunity for international organizations formed by multiple governments. Indeed, in 1945, as the war was ending and the UN was being formed, Congress was affirmatively told that "there exist[ed] … no law of the United States whereby this country can extend privileges of a governmental character with respect to international organizations or their officials in this

country." H.R. Rep. No. 1203, 79th Cong, 1st Sess. (1945).[4] The perceived need for such privileges and immunities in appropriate circumstances led Congress later that year to enact the IOIA.

The IOIA gives (§288a(b)) "international organizations" the "same immunity from suit … as is enjoyed by foreign governments," with limited official-acts immunity (§288d(b)) available to such organizations' "officers and employees."[5] But the statute's definition of

---

[4] For example, it had been the position of the United States that "[o]fficials of the League of Nations [were] not as such considered by this Government to be entitled while in the United States to … privileges and immunities under generally accepted principles of international law," and the U.S. was not a party to the specific treaty that might give them such privileges and immunities. Digest of Int'l Law, Vol IV, Chapter XIV, 422-23 (Dep't of State Publication 1756) (1942), available at: https://babel.hathitrust.org/cgi/pt?id=osu.32435024241911&seq=433.

Thus, when the UN was being planned, the Secretary of State advised the President that "[s]o far as the United States is concerned, legislation will be needed to enable the officials of the United States to afford all of the appropriate privileges and immunities due the Organization and its officials." Dep't of State Publication No. 2349 at 160 (1945), available at: https://babel.hathitrust.org/cgi/pt?id=uiug.30112046487697&seq=160.

[5] The immunity of foreign governments, and its exceptions, is now codified in the Foreign Sovereign Immunity Act ("FSIA"). 28 U.S.C. §§1602 *et seq*. But the FSIA was not enacted until 1976, decades after the IOIA.

"international organization" (§288) makes clear that no organization can enjoy such immunity unless and until it "shall have been designated by the President through appropriate Executive order" as entitled too such protection, and the President (and future Presidents) are given the future flexibility to revoke any prior designation or limit the extent of immunity to which a particular entity or its officers and employees are entitled, as circumstances may warrant.

President Truman's very first designation pursuant to the IOIA conferred IOIA immunity on the UN itself, as well as several of its affiliates including the Food and Agriculture Organization and International Labor Organization. Ex. Ord. 9698 (Feb. 19, 1946). Later in 1946, the UN's General Assembly proposed the CPIUN to its Member States for consideration, but the U.S. did not ratify it until 1970 (as discussed below), apparently because IOIA protection was deemed adequate. UNRWA, as noted above, did not yet exist in 1946, and

---

The District Court did not reach the IOIA issues briefed below, but we present this history as important context for understanding the Senate's eventual ratification of the CPIUN.

UNRWA has never been designated for IOIA protection by any subsequent executive order.

Consistent with President Truman's original separate designation of various UN affiliates, a number of additional UN affiliates were separately designated by subsequent Presidents for IOIA protection, both before and after the eventual ratification of the CPIUN. *See*, *e.g.*, Ex. Ord. No. 10864 (Feb. 18, 1960) (designating Pan American Health Organization ("PAHO")); Ex. Ord. No. 12628 (Mar. 8, 1988) (designating United Nations Industrial Development Organization). Again, it is undisputed that UNRWA has never been so designated.

In 1970, the Nixon Administration lobbied the Senate to ratify the CPIUN, and the Senate did so. 21 U.S.T. 1418 (1970). The State Department explained to the Senate that this was largely a symbolic gesture intended to address UN perceptions, and that for the UN itself and most of its officials the CPIUN would afford no greater protection than the IOIA already provided. A431, A440. The State Department's senior lawyer expressly testified that the CPIUN would not extend beyond the UN to other agencies or organizations. A466. The primary difference, the Senate was told, was that section 19 of the CPIUN would

go beyond the IOIA's existing protection of UN officials to give "the Secretary General and all Assistant Secretaries-General" heightened quasi-diplomatic immunity not expressly limited to their official acts. A437. Because this was a substantive change, the Senate was most focused on it, requested further clarification as to the extent of the increased immunity, and was assured it would be limited to a small number ("approximately 40") of key senior officials. A437, A441, A444, A446.[6]

## IV. UNRWA's Role Within the UN System

### A. UNRWA's Independent Operations

UNRWA is an international organization dedicated to assisting Palestinians. It operates in Gaza and the West Bank, as well as, Jordan, Lebanon, and Syria. It has a significant presence in Manhattan with full-time staff, based here. A158. Worldwide it has over 30,000 employees. A168.

UNRWA administers "a comprehensive, economic, social, infrastructural, educational, and public works regime." A848. Its

[6] That same year, Senators of both parties expressed in the Congressional Record their concern about UNRWA's connection with terrorist training camps and with promoting hatred. A471-476.

operations include the provision of education, health care, relief and social services, emergency assistance, and microcredit. A168. During the relevant period, UNRWA provided primary and secondary education to almost 300,000 students, over half of all students in Gaza. A169.

UNRWA is not funded by the UN's general revenues. A204, A484 (at 1.34). Each year it must raise its own money in voluntary contributions from donor states and private donors through its own efforts. A204-207. And when it experiences budget shortfalls or cash-flow crises due to, for example, donors suspending payment, it cannot rely on the UN to bail it out. A204.

UNRWA banks and contracts in its own name and not in the name of the UN. A190, A204, A208, A491 (UNRWA contracting with the UN).

UNRWA does not take policy direction from the UN but relies on input from its own "Advisory Commission," composed of only a fraction of UN members, many of which are donors. A480 at ¶8, A483 at 1.2. UNRWA's tens of thousands of locally recruited personnel in the Middle East do not participate in the same pay and benefits system as the

personnel of the UN itself. A495, A501, A503. It deals with the UN itself at arms-length in other contexts. For example, dissatisfied UNRWA employees may appeal rulings of UNRWA's own "Dispute Tribunal" to the UN's Appeals Tribunal, but only because UNRWA's head signed a "Special Agreement" with the UN's Secretary General giving the Appeals Tribunal such jurisdiction. A491.

### B. The UN and the UN System

The UN Charter establishes six "principal organs of the United Nations," including the Security Council and the General Assembly. Art. 7(1). It also provides that "[s]uch subsidiary organs as may be found necessary may be established in accordance with the present Charter." Art. 7(2). Similarly, it provides that the General Assembly "may establish such subsidiary organs as it deem necessary for the performance of its functions." Art. 22.

"Since 1945, a 'UN System' has grown up around the UN itself. This system includes the UN along with many funds, programs and specialized agencies, each of which have their own area of work." A846. It is undisputed that not every entity within the UN System is a subsidiary organ, but rather there are many different types of

affiliations and relationships. Plaintiffs submitted below the official organizational chart of the UN System, as then most recently updated in 2023. A478.

On this chart, clearly demarcated "subsidiary organs" include the UN Human Rights Council, as a subsidiary organ of the General Assembly, and peacekeeping operations, as subsidiary organs of the Security Council. A478. UNRWA was listed under "Other Entities" and not as a subsidiary organ. A478.

### C. Facts Concerning Whether UNRWA is a Subsidiary Organ

The parties dispute whether UNRWA should be classified as a subsidiary organ based upon its form and function. Nevertheless, the parties submitted several facts about UNRWA's previous classification as such.

UNRWA was established in 1949 by resolution of the General Assembly. The resolution did not refer to UNRWA as a "subsidiary organ." Instead, it called upon the world's nations to accord to UNRWA the same privileges and immunities they had granted to a predecessor entity known as "United Nations Relief for Palestine Refugees." A480 (¶ 17). Defendants have not shown that the United States ever gave

any immunity to that predecessor entity or that either Congress or the Executive Branch ever took any action to extend immunity to UNRWA in response to the General Assembly's request.

UNRWA presented only a handful of documents in support of its argument to be a UN subsidiary organ. The first two documents Defendants cited to were two out of dozens of General Assembly resolutions reauthorizing UNRWA (G.A. Res. 513 (VI) (Jan 26, 1952); G.A. Res. 1315 (XIII) (Dec. 12, 1958)) which referred to UNRWA as a subsidiary organ. That language does not appear in the numerous subsequent resolutions. *See e.g*. A728 at n.6 (citing examples).

Next, UNRWA cited a 1984 UN legal opinion (1984 U.N. Jurid. Y.B. 157, 188-189, U.N. Doc. ST/LEG/SER.C/22) concerning UNRWA's immunity as an international organization. Notably, that opinion does not state that UNRWA is a subsidiary organ.

Finally, the District Court itself pointed to a later UN System organization chart, modified after the first round of briefing in this action, in which Plaintiffs had relied on the existing chart. This March 2025 chart moved UNRWA into the subsidiary organ category. SPA35.

Defendants put in no evidence to support their claim were officials of the United Nations or Assistant Secretary Generals under CPIUN, Art. V. They put in no evidence of any communication of such status to the U.S. Government (as required by section 17), nor any other official document evidencing confirmation of such status, whether issued by the U.S. State Department or anyone else.

In addition to the pre-suit organizational chart and UNRWA's initial resolution, Plaintiffs submitted a year 2000 UN memorandum which specifically noted that what were sometimes called "affiliated bodies" like UNRWA were "[u]nlike other subsidiary organs," because they "enjoy a considerable degree of autonomy" and "their activities closely resemble those of specialized agencies." A895-96. For these reasons, "because of their special nature these [specific] subsidiary bodies" such as UNRWA "have always been treated differently within the United Nations." *Id.*

## SUMMARY OF ARGUMENT

The CPIUN does not provide immunity to UNRWA and its officers, much less immunity for facilitating mass atrocities and genocidal acts. The broad immunity recognized by the CPIUN applies to the United Nations itself. It does not apply to all of the myriad, affiliated international organizations that have come to be known as the "UN System." As both Plaintiffs and the Government argued below, UNRWA is fundamentally different in form and function from the United Nations and has never been considered identical with it. UNRWA is not funded by the United Nations, its tens of thousands of employees are not employed by the United Nations, and the United Nations does not control its operations.

Both the text and ratification history of the CPIUN indicate that CPIUN immunity was designed to be read narrowly and to further the core purposes of the United Nations. No U.S. Court nor Executive Order has ever granted UNRWA immunity. It is undisputed that there are other UN affiliates outside the scope of the CPIUN's coverage and that such affiliates have immunity in federal court if, but only if, they have been specifically designated by executive order for protection

under the IOIA and it is likewise undisputed that UNRWA has never been so designated.

To find immunity here, the lower court first read an explicit grant of immunity for "subsidiary organs" into the CPIUN, where none exists in the text of the CPIUN's relevant provisions. Second, the court adopted UNRWA's self-serving classification as such a "subsidiary organ" despite a lack of any consistent definition of the term, as well as record evidence to the contrary. The court wrongly found that Plaintiffs bore the burden of proof on this issue, and thus simply ignored that evidence, including the UN's own organizational chart that explicitly classified UNRWA as not a "subsidiary organ" until it was changed for obvious litigation advantage to reclassify UNRWA as a subsidiary organ after the motion to dismiss in the District Court had already been briefed.

The lower court's interpretation of the CPIUN was doubly wrong because, as an international treaty, the CPIUN must be interpreted pursuant to the canons governing international law. Those principals – confirmed by this Court, authoritative canons of treaty interpretation and binding UN Security Council resolutions – provide that no treaty

may violate jus cogens norms, the preemptory foundations of international law, which prohibit committing or abetting genocide, torture and mass atrocities. Similarly, it makes no sense to characterize the Individual Defendants' violations of jus cogens as official acts entitled to protection under the treaty. Such violations are by definition ultra vires and thus not subject to any immunity.

The Complaint details how the Defendants intentionally provided Hamas with the money, infrastructure, safe havens and recruitment necessary to perpetrate the October 7 Attack. The Defendants did not take these actions at the direction of the UN Secretary General or Security Council, and indeed as alleged in the Complaint they did so despite the objections of these actual UN organs. The Defendants undertook these actions operating as a general provider of services out in the world, quite unlike any sort of diplomatic mission, and certainly not consistent with the purposes and principles of the United Nations.

Finally, Plaintiffs are private individuals who do not ask this Court to weigh in on the disputes between Israelis and Palestinians. Rather they seek justice under the law, in the form of money damages, from Defendants who knew better but chose to violate the law of

nations and the laws of the United States to provide material support to a notorious terrorist organization, so designated by Presidents of both parties going back 30 years.

Under well-established precedent, the burden is always on the party claiming immunity to establish that it falls within the class of people or organizations entitled to immunity. Courts do not just take the word of entities claiming to have sovereign or diplomatic immunity, they routinely interrogate those claims based upon the applicable legal test and the evidence presented, or not presented. International treaties must be read first according to their text, and then their ratification history and purpose. Absurd results – like any entity deemed immune by the General Assembly must have impunity for assisting genocide – must be avoided. And acts taken by individuals in support of mass atrocities or genocide cannot be considered "official" acts shielded by their job description because they are as a matter of law ultra vires. Applying these generally applicable principles makes clear that UNRWA and these Defendants are not immune and must answer for their torts like any other Defendant.

Respectfully, it would be an incongruous result indeed if a treaty drafted in the immediate aftermath of the horrors of World War II, and indeed in the same year the Nuremberg Trials were held, could be read to immunize nongovernmental agents to facilitate mass atrocities and to do so from Manhattan.

## ARGUMENT

The District Court's rulings on questions of law, including the interpretation of treaties, are reviewed by this Court de novo. *See Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215 (2d Cir. 1999). *See also Broidy Capital Mgt. LLC v. Benomar*, 944 F.3d 436, 441 (2d Cir. 2019) ("We review de novo a district court's legal conclusions granting or denying immunity"). Decisions denying jurisdictional discovery are reviewed for abuse of discretion. *Swarna v. Al-Awadi*, 622 F.3d 122, 143-44 (2d Cir. 2010). *See also Wiwa v. Shell Petroleum Development Co. of Nigeria*, 335 Fed. App'x 81 (2d Cir. 2009) (reversing denial of jurisdictional discovery in ATS case as abuse of discretion).

## I. THE DISTRICT COURT WRONGLY PUT THE BURDEN ON PLAINTIFFS TO NEGATE DEFENDANTS' CLAIMS OF IMMUNITY

The District Court's first error was in relieving the Defendants of their burden to put forth evidence sufficient to establish their claimed immunity under the CPIUN. SPA32. This was especially important here, where nothing in the text of the CPIUN extends immunity to any, much less all, affiliated entities, and the Defendants needed both to offer an interpretation of the CPIUN's text under which they might be given immunity and then a factual demonstration that they did, in fact, qualify for immunity under the treaty's correct interpretation.

The law is clear that a party claiming to be immune from liability bears the initial burden of demonstrating that it is, in fact, a person or entity protected by the immunity doctrine in question. So, for example, a Defendant claiming protection under the FSIA "bears the burden of establishing a prima facie case that it is a foreign sovereign" in any situation where that may be subject to dispute. *Pablo Star Ltd. v. Welsh Government*, 961 F.3d 555, 559-60 (2d Cir. 2020). *See*, *e.g.*, *Ocean Line Holdings Ltd. v. China National Chartering Corp.*, 578 F.Supp.2d 621, 622-628 (S.D.N.Y. 2008) (rejecting immunity claim

because Defendant corporation failed to meet its burden to show it was agency or instrumentality of Chinese government).

Similarly, an entity created by a state legislature claiming that it is an "arm of the state" that shares the state's Eleventh Amendment immunity bears the burden of demonstrating that. *Hennessey v. Univ. of Kansas Hosp. Auth.*, 53 F.4th 516, 529-530 (10th Cir. 2022) (so holding and agreement with all five other circuits that had explicitly addressed that question). A Defendant claiming diplomatic immunity bears the burden of showing diplomatic status. *Mazengo v. Mzengi*, 542 F. Supp.2d 96, 99-100 (D.D.C. 2008) (rejecting diplomatic immunity defense advanced by individual associated with embassy of Tanzania because he failed to demonstrate that he qualified for such immunity "despite his burden to do so"). And an entity claiming to be protected by the IOIA bears the initial burden of showing that the President has in fact so designated it for protection by executive order. *A.J. Ruiz Consultatoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2024 WL 460482 at *9 (Bankr. S.D.N.Y. Feb. 6, 2024) (International Finance Corporation met its initial burden by so demonstrating).

The District Court erroneously ignored this well-established law, reasoning that (SPA 32) because CPIUN immunity supposedly goes to the federal courts' subject-matter jurisdiction and because it is ordinarily a plaintiff's burden to establish subject-matter jurisdiction, it was therefore Plaintiffs' burden to negate the Defendants' immunity defenses. This makes no sense, and is contrary to the well-established case law including this Court's holding in *Pablo Star*. Plaintiffs met their burden here by alleging claims that gave rise to subject-matter jurisdiction under 28 U.S.C. §§1331, 1350, and 1367(a). That the UN itself might be immune under the CPIUN, creating as a practical matter an exception to the exercise of that jurisdiction, does not provide a basis to require every plaintiff in every case to bear the initial burden of showing that the Defendant they have sued is not the UN.

Indeed, the Supreme Court has held that (unlike the CPIUN) the FSIA "displaces" all other general jurisdictional statutes when it comes to civil cases against foreign states. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488, U.S. 428, 437 (1989)). But the FSIA cannot displace other jurisdictional statutes except in a case that

is actually brought against a foreign state, which is exactly why this Court in *Pablo Star* required any Defendant raising the FSIA to make the initial showing that it is, in fact, a "foreign state" within the statutory definition, which is sometimes far from obvious when the Defendant claims to be protected as an "agency or instrumentality." The District Court's theory – effectively, that a plaintiff should bear the burden of showing that whoever it has sued is *not* a "foreign state" as defined in the FSIA – would require *Pablo Star* to have come out the other way.

And, again, this is important because there is no starting or background presumption that UNRWA has or should have any immunity at all. Rather, as shown above the law in the United States is that no international organization has immunity from suit in federal court unless: a) it has been affirmatively granted immunity by being specifically designated for protection under the IOIA by an executive order (which has never happened with UNRWA); and/or b) it has been affirmatively granted immunity by some other treaty or statute. The law is also clear that not every entity in the so-called UN System is protected by the CPIUN. Not only have some entities within the UN

System been separately designated for protection under the IOIA (confirming that President Truman's designation of the UN itself for IOIA protection did not cover them), some of these entities, as explained below, have likewise long been conceded to be outside the scope of the CPIUN.

## II. NONE OF THE DEFENDANTS ARE WITHIN THE SCOPE OF ANY IMMUNITY PROVIDED BY THE CPIUN

The Dismissal Decision's conclusion that UNRWA was immune from suit was based on two steps: a) that the CPIUN explicitly immunized not only the UN but all of its "subsidiary organs"; b) that UNRWA was such a "subsidiary organ." Both of these were incorrect, and reversible error.

### A. The CPIUN's Text Does Not Expressly Extend Immunity to Any Entities Beyond the UN Itself, and Its Section 11 Has No Relevance to this Case

The District Court concluded that "subsidiary organs" are explicitly immunized by the CPIUN based upon its section 11. (SPA38) That section is part of Article IV on "The Representatives of Members." It reads in pertinent part (italics added for the reason explained below):

> *Representatives of Members to the principal and* subsidiary organs of the United Nations *and to conferences convened by the United Nations,* shall, while exercising their functions *and during the*

> *journey to and from the place of meeting,* enjoy *the following privileges and immunities: (a) Immunity from personal arrest or detention and from seizure of their personal baggage, and,* in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind;

The District Court selectively quoted this section by omitting all of the italicized words to yield (SPA30):

> "[S]ubsidiary organs of the [U.N.] . . . shall, while exercising their functions . . . enjoy . . . in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind."

But this makes no sense at all as applied to UNRWA. This section on its face does not purport to give any immunity to the UN itself, or to its principal or subsidiary organs, and Defendants had not claimed that it did. Rather, its clear language gives, for example, the representative of Finland to a subsidiary organ like the UN's Human Rights Council the same limited immunity as possessed by the Finnish representative to a principal organ like the General Assembly. UNRWA itself is not such a "representative," and no such representatives of any Member are Defendants herein. Indeed, even the District Court's selective quotation makes no sense as applied to UNRWA, because it would mean that UNRWA is only immune for "acts done by [it] in [its] capacity as

representative[]" but it has no such capacity and thus could not have acted in such a capacity.

### B. The "United Nations" Itself Is Given Immunity in Section 2 of the CPIUN, But UNWRA Is Not "the United Nations"

Because of the District Court's reversible error in thinking the irrelevant section 11 provided the correct legal test, it never engaged with or ruled on the Defendants' actual argument that the CPIUN's separate section 2 extended to UNRWA. But that argument was wrong, both as a matter of law and a matter of the facts and record evidence, and cannot provide any basis for affirmance on alternate grounds.

Section 2 reads in pertinent part: "The United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity."

When the UN's in-house lawyer first claimed immunity for the Defendants, the argument that was advanced for the applicability of section 2 to UNRWA was that UNRWA was "an integral part" of the UN. A224. The phrase "subsidiary organ" appears nowhere in that letter. Only after Plaintiffs submitted evidence that showed (A425 - and exhibits cited therein) that UNRWA was not an "integral part" of

the UN did Defendants raise the theory that "United Nations" in section 2 should be read as if it said "the United Nations and all of its subsidiary organs," which was the theory that the District Court then erroneously found applicable via its misreading of section 11.

1. Defendants' Proposed Interpretation of Section 2 Is Grossly Overbroad

A treaty, if self-executing, is a source of rules of decision for the federal courts comparable to a statute, and to be interpreted in much the same way as a statute. *See*, *e.g.*, *Sacirby v. Guccione*, 589 F.3d 52, 66 (2d Cir. 2009) (citations and quotations omitted). *See also Georges v United Nations*, 834 F.3d 88, 92 (2d Cir. 2016) (observing in context of the CPIUN that "The interpretation of a treaty, like the interpretation of a statute, begins with its text"). *Georges* also noted that "because as a general matter, a treaty is a contract between nations," contract interpretation principles may be helpful in interpreting the text. *Id*. at 94 (quotation and citation omitted).

The CPIUN does not have some unique status or authority because it is "international law," although the Dismissal Decision (SPA30, 32) may have suggested so. To the contrary, international law can provide a rule of decision in this Court if, and only to the extent

that, a valid Congressional or state statute incorporates it (as some certainly do, including the ATS) or the Senate has ratified a specific self-executing treaty not contradicted by later legislation. *See*, *e.g.* *Medillin v. Texas*, 552 U.S. 491, 504-5 (rejecting arguments that any sources of international law are binding on U.S. courts without being embodied in domestic implementing legislation or a ratified self-executing treaty); *Diggs v. Schultz*, 470 F.2d 461, 465 (D.C. Cir. 1972) (rejecting attack on Congressional statute facially inconsistent with earlier binding Security Council resolution, because it "is settled constitutional doctrine that Congress may nullify, in whole or in part, a treaty commitment"); *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 190 (2d Cir. 2014) (recognizing same well-established rule that Congress may enact a valid statute inconsistent with an earlier treaty).

Against that background, section 2 of the CPIUN must be interpreted to give it a fair construction, neither overly narrow nor overly broad. An overbroad construction is particularly inappropriate in the immunity context, because it is never the law that an entity legally entitled to absolute immunity is permitted to unilaterally extend that immunity to any other affiliated entity it chooses to create.

For example, the current language of the FSIA expressly extends limited immunity to an "agency or instrumentality of a foreign state" as well as the foreign state's own government, 28 U.S.C. §1603(a), but this extension is part of the same legislative compromise that makes both foreign governments and their agencies and instrumentalities subject to being sued in federal court for any of the enumerated exceptions to immunity set forth in 28 USC §1605. The earlier pre-FSIA case law, from a time when the immunity of foreign governments proper was generally thought to be absolute, did not recognize any such immunity for their agencies or instrumentalities.[7] *See*, *e.g.*, *Ulen & Co. v. Bank Gospodarstwa Krajowego*, 261 A.D. 1 (2d Dep't 1940) (no immunity for entity claiming to be instrumentality of Polish government); *United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199 (S.D.N.Y. 1929) (no immunity for entity organized and controlled by French government); *Coale v. Society Co-Operative Suisse de Charbons, Basle*, 21 F.2d 180 (S.D.N.Y. 1921) (no immunity for entity organized and controlled by Swiss government). Under the FSIA's explicit and

---

[7] *See Jam v. Int'l Finance Corp.*, 586 U.S. 199, 210-11 (2019) (discussing subsequent evolution of case law).

expansive definitional language, the Defendants in those cases would likely now be agencies or instrumentalities covered by the FSIA, but the claims against them would likewise now go forward under the FSIA's explicit commercial-activities exception to immunity.

The same refusal to permit immune entities to extend blanket immunity to any other entity they create applies domestically. For example, this Court has repeatedly ruled that the Eleventh Amendment immunity of the State of New York does not extend to any entity the State may choose to create, and that evaluating an immunity claim by a particular such entity requires careful examination of its functions, governance, and funding. *See*, *e.g.*, *Mancuso v. New York State Thruway Authority*, 86 F.3d 289 (2d Cir. 1996) (rejecting Thruway Authority's claim to the State's Eleventh Amendment immunity after fact-intensive consideration of six different factors); *Leitner v. Westchester Community College*, 779 F.3d 130 (2d Cir. 2015) (community college within SUNY system not entitled to Eleventh Amendment immunity even though certain other SUNY institutions are).

The District Court arrived at an impossibly overbroad exception because it decided to extend immunity to any UN "subsidiary organ" without using any sensible definition of "subsidiary organ" that might make sense as a test for immunity. Internal UN documents Plaintiffs provided to the District Court indicate that "subsidiary organ" is at best a vague word with apparently varying uses in UN parlance, and that on the broadest meaning of the term (like the District Court embraced here) the range of entities that might be so labeled "var[ied] widely with respect to their membership, structure, scope of activity, powers, method of reporting and duration." A895.

Indeed, in order to conclude that UNRWA itself was a "subsidiary organ" after having concluded that "subsidiary organ" was the test, the District Court had to ignore the UN's own organizational chart of the UN System that Plaintiffs had put in the record. A478. That chart clearly shows that UNRWA is *not* a subsidiary organ, listing other specified entities as "subsidiary organs of the General Assembly" and still others as subsidiary organs of the Security Council while relegating UNRWA to a separate miscellaneous category of "Other Entities." Yet the District Court decided (SPA35) that it could, without discovery or

any ability to make credibility determinations, ignore the UN's own organizational chart because, while this litigation was pending and the Defendants' motion to dismiss was already briefed, the UN's website replaced it in March 2025 with a different chart that did purport to reclassify UNRWA as a subsidiary organ.[8]

Even leaving aside the obvious inference that an organizational chart changed mid-litigation for obvious litigation advantage is not credible, this would at most show that "subsidiary organ" is used in broader senses and narrower senses, yet the District Court never explained or justified why the broadest possible interpretation would make any sense for assessing immunity claims. [9]

---

[8] The District Court pooh-poohed the earlier chart because it was labeled "for informational purposes" (SPA35), but that it is hardly an admission that it was inaccurate. Indeed, substantially the same chart, making equally clear that UNRWA is not a "subsidiary organ," was included as the last page of the Secretary-General's 2024 Annual Report. https://www.un.org/sites/un2.un.org/files/sg_annual_report_2024_en.pdf

[9] That two General Assembly resolutions out of dozens mentioning UNRWA label it a "subsidiary organ," as discussed above at 20, again suggests that at best "subsidiary organ" does not have a fixed meaning but is used loosely, sometimes with a broader meaning and other times with a narrower meaning. This simply confirms that such a label cannot be the basis for a stable interpretation of a section of the CPIUN that does not even use the phrase.

The District Court appeared (SPA30) to accept the theory that since article 22 of the UN Charter authorizes (emphasis added) the General Assembly to "establish such subsidiary organs as it deems necessary *for the performance of its functions*," absolutely every entity the General Assembly might establish is thus by definition a "subsidiary organ." But nothing supports this view, which among other things ignores the Charter's own language about "performance of its functions." The functions UNRWA performs, such as operating schools and health-care facilities in Gaza, are hardly delegated from, or intended to assist with, the General Assembly's own core functions of discussion, policy proposals, and budget approvals as set forth in the Charter's articles 10 through 17. The Government's submission below (A845) explained in detail why even assuming arguendo that "subsidiary organs" were protected by section 2 despite not being mentioned, any sensible and functional understanding of what a subsidiary organ is generally understood to be would exclude UNRWA. The Dismissal Decision failed to engage with or respond to the Government's arguments.

And that is indeed the greatest problem with the District Court seizing on the phrase "subsidiary organ" in the inapplicable and irrelevant section 11 as if it could be implicitly read into section 2. If the phrase "subsidiary organ" actually did have such a wide scope as to encompass any and every entity the General Assembly might ever choose to create, regardless of its activities, governance, and funding, then it cannot possibly be the right test for section 2 immunity. It would be exactly like saying that any and every entity the New York Legislature might choose to create would automatically share the New York's own Eleventh Amendment immunity regardless of any other relevant facts, which as shown above is not the law.

Indeed, the General Assembly itself, when it created UNRWA in 1949, did not endorse the expansive theory of its own unilateral power to confer immunity that UNRWA now relies on. Quite to the contrary. Not only does that 1949 resolution nowhere characterize UNRWA as a "subsidiary organ," what it says about immunity, as noted above, is a non-binding "call" (A480 ¶17) to "the Governments concerned to accord to [UNRWA] the privileges, immunities, exemptions and facilities which have been granted to the United Nations Relief for Palestine Refugees,

together with all other privileges, immunities, exemptions and facilities necessary for the fulfilment of its functions." In other words, the General Assembly explicitly did *not* take the position that UNRWA should enjoy the same privileges and immunities granted to the UN itself.

Nor does this Court's case law addressing the CPIUN does not support the District Court's overbroad reading of it. The District Court mentioned (SPA 30-31) *Georges*, 834 F.3d at 249, *aff'g* 84 F. Supp. 3d 246 (S.D.N.Y. 2015). The UN itself was a named Defendant in that case, and was unquestionably covered by section 2. That decision also assumed that the UN's own section 2 immunity extended to Defendant MINUSTAH, the UN's military peacekeeping and stabilization force that had been deployed in Haiti by the Security Council. But the decision assumed that, rather than deciding it, because, as the briefing confirms[10], the Plaintiffs-appellants never disputed that section 2 applied to MINUSTAH in either the District Court or this Court, only

[10] *See* S.D.N.Y. 13-cv-7146, Docs. 33 & 43; 2d Cir. 15-455-cv, Doc. 40-1.

arguing an exception to that immunity that did not persuade either court.

Without briefing on the issue, there was no holding on the legal question of the scope of section 2. *See, e.g.*, *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 153 (2d Cir. 2016) (a "sub silentio holding" in earlier case on issue not disputed by parties there "is not binding precedent" because earlier court "did not independently analyze" its merits) (citations and quotations omitted). In any event, there are multiple relevant differences between MINUSTAH (an entity exercising core sovereign military powers that could not be exercised by private actors) and UNRWA (an entity whose core mission involves exactly the same sort of work among poor or refugee populations commonly carried out by private-sector charities and NGOs with no claim to sovereign immunity). A reasonable construction of section 2, not attempted by this Court in *Georges* because unnecessary, might well include MINUSTAH but would not for that reason extend to UNRWA.[11] Indeed, the same 2023 UN

[11] The District Court likewise thought (Decision at 22-23) that the reference in *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010),

organizational chart that explicitly excludes UNRWA from its lists of "subsidiary organs" does include peacekeeping operations (such as MINUSTAH) within the subsidiary organs of the Security Council. A478.

Faced with the lack of any prior case law holding or even implying that UNRWA was immune under the CPIUN, the District Court erroneously placed weight (SPA36) on a 1984 memorandum from the UN's internal "Office of Legal Affairs" asserting that UNRWA had immunity in the context of an arbitration proceeding pending in an unspecified country. But not only are such internal opinions by a litigant's own affiliate not authority binding on the federal courts, this memorandum (1984 U.N. Jurid. Y.B. 157, 188-189, U.N. Doc. ST/LEG/SER.C/22) is not even persuasive. It mentions in passing the CPIUN, but does not even attempt to construe section 2, does not refer to prior authoritative decisions construing it, and does not discuss its text, structure or purpose. The memorandum does not assert that

---

to the individual Defendants there as "former United Nations officials" bolstered its conclusion, but in that case the Defendants' claim to be within the scope of the CPIUN's protection again went unchallenged by the Plaintiffs-appellants, who instead focused unsuccessfully on a potential exception to immunity.

section 2 covers "subsidiary organs," and does not assert that UNRWA is a "subsidiary organ."

Rather, this memorandum largely ignores the CPIUN as such, asserts generally that UNRWA is immune under "the public international law governing the status, privileges and immunities of international organizations," and further asserts that the arbitrator ought to ignore the relevant (unspecified) country's "domestic law except to the extent, of course, that it incorporates relevant international obligations."

But these arguments cannot have any weight in this Court, because as shown above at 35, in American courts "public international law" is irrelevant unless and until it has been properly incorporated into domestic law. No abstract law of "international organizations" is enforceable here, only the IOIA, as supplemented by, for example, specific treaties if and only if ratified by the Senate. And under the IOIA there is as explained above no general immunity for "international organizations" such as UNRWA, only immunity for the specified organizations that have been so designated by executive order. As already explained, the UN itself has been so designated, as have many

of its affiliates, but UNRWA has never been designated for IOIA protection and thus has no immunity under it.

Indeed, the IOIA caselaw itself confirms the limited scope of the CPIUN. In the high-profile case of *Rodriguez v. Pan American Health Organization*, 29 F.4th 706 (D.C. Cir. 2022), the immunity of the Defendant PAHO, a UN affiliate, was evaluated under the IOIA, because it had been specifically designated for IOIA protection by executive order, although the court concluded that one of the exceptions to IOIA immunity allowed the case to proceed. The district court had noted that it was undisputed that PAHO was outside the scope of the CPIUN's protection, 502 F. Supp. 3d 200, 227 (D.D.C. 2020), and the D.C. Circuit accordingly never even mentioned the CPIUN. The District Court here claimed (SPA36-37) that this is irrelevant because PAHO is a "specialized agency" in the technical sense referred to in articles 57 and 63 of the UN Charter while UNRWA is not. But this misses the point.

The CPIUN does not mention specialized agencies in its text and certainly does not explicitly exclude them from coverage via a carve-out from otherwise broad language. But it is undisputed that the CPIUN

does not apply to these specialized agencies because section 2's reference to "the United Nations" is not broad enough to cover them. There is no plausible interpretation of "United Nations" in section 2 that could be broad enough to cover absolutely every other entity in the UN System, regardless of its activities, governance, or funding, while also excluding the "specialized agencies" as defined in this technical non-functional sense. Both Plaintiffs and the Government showed below (A846-853, A904-905, A913-15) that UNRWA is functionally similar to the specialized agencies, and thus falls outside the scope of the CPIUN for the same reason they do.[12]

2. UNRWA Is Not Covered by Section 2 Because Its Activities, Governance, and Funding Are All Distinct from the United Nations Itself

As was explained in the Government's submission which was ignored by the District Court (A849), UNRWA is outside any plausible scope of section 2 of the CPIUN because as a factual and functional

[12] The US has never ratified a separate treaty (known as the CPISA) that would provide additional immunity beyond the IOIA to various UN affiliates that are "specialized agencies" in this technical sense. *See Rodriguez*, 29 F.4th at 719 (noting lack of ratification and rejecting argument that the US had accepted that treaty "by implication"). But, again, that UNRWA might technically not be within the scope of a *separate* treaty the US has not ratified does nothing to affirmatively establish that it *is* within the scope of the treaty the US did ratify.

matter its activities, governance, and funding (all detailed supra at 16-18) make it more akin to the specialized agencies which no one claims have any CPIUN protection.

This same comparison has long been recognized within the UN System itself. An analysis in the UN's own Juridical Yearbook for 2000 (A896, emphasis added) expressly notes that a specific group of UN affiliates including UNRWA are "[u]nlike other subsidiary organs" because they "enjoy a considerable degree of autonomy," "have substantial operational independence" as well as independence "in financial matters since most of them are financed through voluntary contributions," such that "their activities *closely resemble those of specialized agencies*." For these reasons, "because of their special nature these [specific] subsidiary bodies" such as UNRWA "have always been treated differently within the United Nations." There is no rationale in either the text of the CPIUN or anything else for one-size-fits-all approach to immunity when dealing with such a disparate and varied group of entities.

Nor is this result in any way incongruous. As already noted, UNRWA's actual activities do not resemble the quasi-governmental

sovereign functions of the General Assembly or Security Council but are identical to the activities carried on in many parts of the world by many private charities or NGO's working with refugees or impoverished populations. If any such NGO, however benevolent its announced mission, strayed outside its mission to provide material assistance to a terrorist group and got sued by the terrorists' victims, it would have no claim to absolute immunity, nor should it. Similarly, this Court's denial of Eleventh Amendment immunity to the community college in *Leitner,* 779 F.3d at 139, simply means that that college is similarly situated to a private college sued for the same alleged wrongdoing when there is no obvious reason it should have greater immunity than the private college does. And the denial of Eleventh Amendment immunity to the state-university-affiliated hospital in *Hennessey*, 53 F.4th at 552-553, simply left it in the same position as any other non-profit hospital sued for the same type of alleged wrongdoing, with again nothing incongruous about that result.

And the lack of any obvious rationale for immunity here is even clearer given UNRWA's separate and independent funding from voluntary contributions solicited from its own donor base, outside the

UN's own system of tax-like mandatory assessments of its members' national governments. A lawsuit against UNRWA will thus not result in a judgment that the UN itself is obligated to pay from UN funds. The Eleventh Amendment caselaw, for example, is attentive to whether a lawsuit against an entity other than the state itself may effectively seek a judgment against the state's own treasury and taxpayers. *See Mancuso*, 86 F.3d at 296 (rejecting Thruway Authority's claim to immunity because it is largely self-funded); *Leitner*, 779 F.3d at 138-39 (rejecting community college's claim to immunity even though approximately a third of its budget came from appropriations from state legislature when bulk did not).

Prior CPIUN litigation has appropriately focused on this same financial issue. For example, in *Shamsee v. Shamsee*, 74 A.D.2d 357 (2d Dep't 1980), the court refused to allow an ex-wife to collect money owed to her by executing against her ex-husband's alleged interest in the United Nations Joint Staff Pension Fund. The court determined that the assets that fund held (provided by the UN, and held to satisfy future UN obligations to its retirees) were, "although held separately from other United Nations property … the property of" the UN itself,

and thus separately protected by the explicit language of section 2 of the CPIUN. *Id*. at 361. Indeed, UN's own funds would have been protected by the terms of the CPIUN from the ex-wife's creditors even if they had been on deposit at a commercial bank.

For all of these reasons, the CPIUN's section 2 does not extend to UNWRA and UNRWA has no other claim to immunity broader than the CPIUN, under the IOIA or any other source.

### C. "Officials of the United Nations" Are Given Limited Immunity By Section 18, But the Individual Defendants Are Not Officials "of the United Nations"

All of the Individual Defendants claimed to have immunity under section 18 of the CPIUN. That section provides in pertinent part (emphasis added) that "Officials *of the United Nations* shall: (a) Be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity."

But the Individual Defendants were, as alleged in the Complaint, all officials of UNRWA, not of the UN, at the time of the acts for which they are sued. A159-60. Because as explained above UNRWA is not "the United Nations" for purposes of section 2 immunity, its officials are necessarily not officials "of the United Nations" for purposes of section

18 immunity. That alone disposes of their claim to immunity, and makes it unnecessary for this Court to even reach the question of whether the acts they were sued for were acts "in their official capacity," although that separate issue is addressed in the alternative below at 59-62.

Indeed, if the UN had (rightly or wrongly) considered them to be "officials of the United Nations" protected by section 18 prior to the filing of this lawsuit, it would have included their names on the routine lists of such officials that section 17 requires be periodically "made known to the Governments of Members," but no such lists (which would be readily available to Defendants if they existed) were submitted by them to the District Court. Nor was any documentary evidence submitted showing that the U.S. Government had acknowledged or recognized the claimed status ("diplomatic" or otherwise) of any of the Individual Defendants prior to the filing of this lawsuit.

### D. Under-Secretary-Generals of the UN are Given Additional Immunity by Section 19 of the CPIUN, But Neither Lazzarini nor Grandi Is or Was an Under-Secretary-General

Section 19 of the CPIUN reads in pertinent part: "In addition to the immunities and privileges specified in section 18, the Secretary-

General and all Assistant Secretaries-General shall be accorded … the privileges and immunities, exemptions and facilities accorded to diplomatic envoys, in accordance with international law." It is common ground that Under-Secretary-Generals are covered by this section. Here, Defendants asserted that two of them, Lazzarini and Grandi, "both … *hold the rank of* UN Under-Secretary-General," citing to no record evidence for that assertion other than an unsworn lawyer's letter. A745 (emphasis added, citing A231). Plaintiffs objected that there was no evidence to support this assertion, much less any evidence that either of the two was actually employed as, or performing the function of, an Under Secretary General rather than simply claiming the "rank" as an honorific while holding a different job elsewhere in the UN system. A816-17.

The District Court accepted (SPA47 n.4) as conclusive evidence of these two Defendants' alleged status an online and unverified UN list linked in the Defendants' reply brief in support of their motion to dismiss (A836 n.5), which Plaintiffs had no opportunity to challenge. But on its face, that document affirmatively *contradicts* their section 19 claim. It lists both Grandi and Lazzarini in a category of "Under-

Secretaries-General and Officers of equivalent rank," in which some individuals on the list are individually specified to be Under-Secretaries-General but others, including Grandi and Lazzarini, are not.[13] In other words, the UN's own position is not that they are actually Under-Secretaries-General but that they are simply "of equivalent rank."

Whatever "equivalent rank" may mean internally in the UN System, in terms of individual compensation packages or the protocol for seating at formal dinners, it means nothing for purposes of immunity under the CPIUN. The plain language of section 19 gives immunity only to "the Secretary-General and all Assistant Secretaries-General" but says nothing extending that immunity to other "Officers of equivalent rank." It provides no coverage whatsoever to "Officers of equivalent rank" beyond what they might already have under section 18. And it would again make no sense for the Senate, by treaty, to have

---

[13] Available at: https://www.un.org/dgacm/sites/www.un.org.dgacm/files/Documents_Protocol/listofunseniorofficials.pdf This document may be updated or otherwise changed in the future and the Defendants did not put a copy of it in the record. We have saved a copy of the current version (as most recently updated in late 2025) should the Court wish to review it.

given the UN a blank check to designate any of its other employees (or its affiliates' employees in addition to its own) as "Officers of equivalent rank," a blank check that could be used to confer such quasi-diplomatic immunity unilaterally on additional dozens, hundreds, or even thousands of individuals. Indeed, as noted above, the Senate was specifically concerned about section 19 and was assured by the State Department that it would only apply to a very limited number of the UN's top management assisting the Secretary-General. A437, A441, A444, A446.

That alone disposes of the claim to section 19 protection, and makes it unnecessary for this Court to even reach the question of whether the acts they were sued for were within or outside the scope of the protection section 19 could provide, although that separate issue is addressed in the alternative below at 62-64.

In any event, this issue is now moot as to Grandi due to developments subsequent to the Dismissal Decision. Grandi retired from his post-UNRWA position as High Commissioner for Refugees (his job "of equivalent rank" as Under-Secretary-General) as of December 31, 2025, as confirmed by an official press release announcing the

selection of his successor. *See* https://www.unrefugees.org/news/grandi-welcomes-election-of-barham-salih-as-un-high-commissioner-for-refugees/. Section 19 could thus, at most, entitle him to the same protection as a *retired* diplomat, which unlike the broader immunity of a serving diplomat applies "only with respect to acts performed by such a person in the exercise of his functions as a diplomatic envoy." *Brzak*, 597 F.3d at 113 (discussing scope of section 19 immunity in the context of claims against, inter alia, retired UN Secretary-General) (quotation and citation omitted). However, the claims against Grandi are not based on any of his acts as High Commissioner of Refugees, with "rank" equivalent to Under Secretary-General, but only on his earlier acts while employed at UNRWA before ever becoming High Commissioner. A160. Accordingly, section 19 could no longer be potentially relevant to the claims asserted against Grandi in this action.

## III. ANY PROTECTION PROVIDED BY THE CPIUN TO ANY OF THESE DEFENDANTS WOULD NOT PROVIDE IMMUNITY FOR AIDING AND ABETTING GENOCIDE AND OTHER JUS COGENS VIOLATIONS

Because none of the Defendants here are entitled to any immunity under the CPIUN (or IOIA), this Court need not consider the scope of immunity the CPIUN would provide to hypothetical Defendants that

were within its scope. That said, if the Court were to reach that issue, the CPIUN would not provide immunity for the jus cogens violations the Complaint specifically alleges against the Defendants.

As this Court has explained:

> A jus cogens norm, also known as a peremptory norm of international law, is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character. Jus cogens embraces customary laws considered binding on all nations, and is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations. Accordingly, we have previously explained that these norms may not be violated, irrespective of the consent or practice of a given State. Because jus cogens norms do not depend solely on the consent of states for their binding force, they enjoy the highest status within international law.

*Kashef v. BNP Paribas, S.A.*, 925 F.3d 53, 61 (2d Cir. 2019) (citations and quotations omitted).

The atrocities committed against the Plaintiffs by Hamas as alleged in the Complaint, including genocide, attempted genocide, hostage-taking, torture, and weaponized mass rape, are all jus cogens violations, and this Court recognized close to a half-century ago that jus cogens violations give rise to claims under the ATS in the leading decision of *Filartega v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) ("for

purposes of civil liability the torturer has become like the pirate and slave trader before him hostis humani generis, an enemy of all mankind"). This statement from Judge Kaufman's opinion for this Court was quoted with approval in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004), which held that the ATS should neither be read too broadly nor too narrowly. In fact, *Sosa* implies that almost any claim that constitutes a "tort … committed in violation of the law of nations" actionable under the ATS will be a jus cogens violation. *Id.* at 692 (quoting *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994), for proposition that "[a]ctionable violations of international law must be of a norm that is specific, universal, and obligatory"). And aiding and abetting a jus cogens violation is itself a jus cogens violation.[14]

---

[14] *See*, *e.g.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 248-249 (2018) (assuming for purposes of its analysis not only "that those individuals who inflicted death or injury by terrorism [had] committed crimes in violation of well-settled, fundamental precepts of international law, precepts essential for basic human-rights protections" but that those "who knowingly and purposefully facilitated banking transactions to aid, enable, or facilitate the terrorist acts would themselves be committing crimes under the same international-law prohibitions").

Recent prosecutions for war crimes take the same view. *See*, *e.g.*,

### A. Section 18 of the CPIUN Does Not Provide Individual "Official Acts" Immunity for Jus Cogens Violations, Because They Are Ultra Vires

Even for "officials of the United Nations," which the Individual Defendants were not, section 18 only provides immunity for acts "performed by them in their official capacity."

Violations of jus cogens norms, as a matter of law, are ultra vires, and thus cannot be committed in the official capacity of any official of any nation or any international organization. This follows directly from the logic of this Court's holding in *Kashef*. In *Kashef*, the Defendants were sued for allegedly aiding and abetting the government of Sudan and had convinced the district court, 316 F. Supp.3d 770 (S.D.N.Y. 2018), that they were immune under the "act of state" doctrine – arguing there could be no secondary liability when there was no

---

Art. 7(1) of the Security-Council-approved Statute of the International Criminal Tribunal for the Former Yugoslavia, available online at https://www.icty.org/x/file/Legal%20Library/Statute/statute_sept09_en.pdf: ("A person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime referred to in articles 2 to 5 … shall be individually responsible for the crime.") And the principle was recognized contemporaneously with the drafting of the CPIUN in "Principle VII" of the "Nuremberg Principles" as summarized by the UN's own ILC: "Complicity in the commission of a … war crime, or a crime against humanity … is a crime against international law." A606.

primary tort and that the federal courts could not find a primary tort without improperly evaluating the legality under Sudanese law of the Sudanese government policies they had aided and abetted. This Court reversed, 925 F.3d at 62, holding that because the Sudanese government could not, as a matter of fundamental international law, validly decide to commit genocide or other jus cogens violations, it therefore could not validly authorize the Defendants to assist it in those violations, meaning that the Defendants' defense must be rejected. *See id.* at 60 ("a universal international consensus prohibit[s] us from deeming genocide an 'official act' of Sudan").

*Kashef* favorably cited, *id.* at 62 n.7, *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012), which is directly on point. As *Yousuf* put it, 669 F.3d at 776, "Unlike private acts that do not come within the scope of foreign official immunity, jus cogens violations may well be committed under color of law and, in that sense, constitute acts performed in the course of the foreign official's employment by the Sovereign. However, as a matter of international and domestic law, jus cogens violations are, by definition, acts that are not officially authorized by the Sovereign."

The Defendant in *Yousuf* had been a high-ranking official in a prior government of Somalia and was allegedly responsible for torture, arbitrary detention, and extrajudicial killing. The Fourth Circuit explicitly rejected his claim that he was immune because he was supposedly acting in his official capacity as defense minister or prime minister in connection with the jus cogens violations alleged, squarely holding that official-acts immunity could not extend to jus cogens violations. 699 F.3d at 777.

The logic of this Court's holding in *Kashef* means that the holding of *Yousuf* applies here, and requires reversal. The Dismissal Decision distinguished *Yousuf* in a footnote (SPA48 n.5) solely with the (inaccurate) statement that in that case "the [asserted] basis for immunity was the FSIA, not the CPIUN."[15] But that makes no sense at all. Why should a jus cogens violation be an official act entitled to immunity if committed by an official "of the United Nations" but not if

[15] It was an earlier decision in that very case that established that a former official of a foreign state is not himself a "foreign state" protected by the FSIA, but is instead protected by continuing common-law immunity not displaced by the FSIA. *Samantar v. Yousuf*, 560 U.S. 305 (2010).

committed by the Defense Minister of Somalia? The District Court did not attempt to answer this question, because it cannot be answered.

Holding "official acts" immunity to give individuals impunity for jus cogens violations is also particularly incongruous given the history of the CPIUN and for that matter the IOIA. Both were drafted in the immediate aftermath of World War 2, while the Nuremberg Trials were underway, and the immunity they grant to individuals must be interpreted in that context. Indeed, in its 1947 Resolution 177, the UN General Assembly directed the UN's International Law Commission to formulate for future reference the so-called "Nuremberg principles." A602-03. As summarized by the ILC, Principle III states: "The fact that a person who committed an act which constitutes a crime under international law acted as … [a] responsible Government official does not relieve him from responsibility under international law." A605. There is again absolutely no basis to argue that an alleged "official of the United Nations" should enjoy impunity that a "responsible Government official" of an individual nation cannot, and no basis to claim that the CPIUN affirmatively provides such an official impunity for the very acts that the Nuremberg trials convicted individuals for, on

grounds that the UN's own ILC codified at the General Assembly's direction.

### B. Section 19 of the CPIUN Does Not Provide Individual Immunity for Jus Cogens Violations, Because They Are Ultra Vires

The reason Lazzarini (and Grandi) wrongly claimed to have Section 19 as well as section 18 protection because of their supposed "rank" is that the quasi-diplomatic immunity conferred by section 19 extends (prior to retirement or reassignment) beyond official acts to purely personal matters. For example, it protects a serving diplomat or serving Assistant Secretary-General from arrest for entirely unofficial acts such as drunk driving or bar fights. But it is not absolute and has explicit and well-recognized exceptions.

As this Court has explained, one of those exceptions is that there is no diplomatic immunity from civil lawsuits based on "any professional or commercial activity exercised by the diplomatic agent in the receiving state outside his official functions." *Broidy*, 944 F.3d at 445 (citing/quoting Vienna Convention on Diplomatic Relations at 31(1)(c)). The "precise contours" of this exception remain "unsettled." *Id*. at 445. But for substantially the same reasons jus cogens violations by any individual public officer are ultra vires and thus cannot as a

matter of law be official acts for purposes of section 18 immunity (supra at 60-62), such violations, given the U.S. nexus with Defendants' wrongdoing alleged in the Complaint (A204-209), would be inherently "outside [Lazzarini's] official functions" but still (because not purely personal activities) "professional or commercial."[16] Accordingly, section 19 cannot provide immunity for them.

### C. Well-established Rules of Treaty Interpretation Show That the CPIUN Does Not Confer Impunity for Violations of Jus Cogens Norms on Any of the Defendants

As noted above, there are specific established canons of treaty interpretation not always parallel to those of statutory interpretation. This Court in *Mora v. New York*, 524 F.3d 183, 196 (2d Cir. 2008), recognized the Vienna Convention on the Law of Treaties ("VCLT") as persuasive authority on those customary principles of treaty interpretation, although the US has not formally ratified the VCLT. Articles 53 and 64 of the VCLT set forth the well-established rule that a treaty among nations is void and unenforceable if it violates a jus

[16] Defendants have asserted that *Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004) rejected the applicability of this exception to jus cogens violations, but in that case the Plaintiff both appears not to have pursued this argument and did not point to any activity by that Defendant in the U.S., unlike here.

cogens norm, just as an ordinary private contract will be held void for illegality or for violating public policy. The American Law Institute teaches the same principle. Restatement (3d) of Foreign Relations Law of the United States §102, cmt. j ("an agreement will not supersede a prior rule of customary law that is a peremptory norm of international law [jus cogens]; and an agreement will not supersede customary law if the agreement is invalid because it violates such a peremptory norm"). And so does the UN's own International Law Commission. A539-545 (Conclusions 10, 11 & 12). The ILC also concludes that a "resolution, decision or other act of an international organization that would otherwise have binding effect" is ineffective to the extent it conflicts with a jus cogens norm. A553-555 (Conclusion 16). Accordingly, the CPIUN, as a treaty, would be unenforceable to the extent it is interpreted to provide impunity for Defendants charged with aiding and abetting genocide and similar jus cogens violations and must be interpreted to avoid that result.

Contrary to what the District Court seemed to think, Plaintiffs are not asking for judicial activism to override the CPIUN's text. Plaintiffs are only asking for that text to be interpreted in light of the proper

principles governing treaty interpretation. The District Court noted that this Court has refused to infer a jus cogens exception to FSIA immunity. SPA43 (citing *Carpenter v. Republic of Chile*, 610 F.3d 776 (2d Cir. 2010)). But the FSIA is not a treaty, so principles specific to treaty interpretation do not apply to it.[17]

Just as significantly, the UN itself has authoritatively rejected the impunity from jus cogens violations that these Defendants now seek to hide behind. Security Council Resolution 1373, adopted in 2001 under Chapter VII of the UN Charter, authoritatively declares (emphasis added) "that acts, methods, and practices of terrorism are *contrary to the purposes and principles of the United Nations* and that knowingly financing, planning and inciting terrorist acts are also contrary to the

---

[17] Moreover, this Court noted specifically in *Smith v. Socialist People's Libyan Arab Jamahiriya,* 101 F.3d 239, 245 (2d Cir. 1996), that (unlike the CPIUN) the FSIA has numerous other specific legislatively-crafted exceptions to immunity, and Congress could add a jus cogens exception if it wished.

Here, as briefed below (A723-26), if the IOIA did apply to UNRWA, which it does not, the claims in the Complaint would fall within various of the FSIA's other specific exceptions incorporated into the IOIA, including the commercial activities exception. The Dismissal Decision did not reach these IOIA issues, so we do not discuss them further here.

purposes and principles of the United Nations." A584. That resolution also affirmatively requires all UN Members, including the U.S., to "[e]nsure that any person who participates in the financing, planning, preparation or perpetration of terrorist acts … is brought to justice."[18] A583. The Complaint here alleges, with voluminous supporting detail, that UNRWA helped finance and provide other substantial assistance to Hamas' terrorism and genocide in the October 7 Attack.

Resolution 1373 is directly relevant to this Court's interpretation of the CPIUN, because the CPIUN's preamble (in the second "Whereas" clause, emphasis added) states that the United Nations itself should "enjoy in the territory of each of its Members such privileges and immunities *as are necessary for the fulfillment of its purposes*." In treaty interpretation, this Court has emphasized that a "preamble is not without meaning" but "provides valuable context for understanding the terms of a treaty." *Mora*, 524 F.3d at 196. Here, via Resolution

---

[18] When the Security Council acts pursuant to Chapter VII, as it expressly did in this resolution, the resolution is binding international law rather than merely hortatory. *See Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 261 (2d Cir. 2003); A588 (U.S. ambassador to UN explaining that "only under Chapter 7 is the [Security Council] action mandatory on all UN members").

1373, the Security Council has authoritatively and explicitly informed the world that impunity for financing terrorism is not necessary for the fulfillment of the UN's purposes but is directly contrary to those purposes, and this Court should interpret the CPIUN accordingly.

## IV. IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY TO TEST THE FACTUAL GROUNDS FOR DEFENDANTS' CLAIMED STATUS

Because the burden was on Defendants to make the initial factual showing that they were the sort of entity or persons within the scope of the CPIUN (i.e. that they actually were "the United Nations" or "officials of the United Nations" or Under-Secretaries-General) and they did not meet that burden, their motion to dismiss should have been denied. But in the alternative, Plaintiffs should have been afforded limited and targeted discovery to challenge the Defendants' factual assertions.

In other immunity contexts, the need for discovery is well-recognized when necessary to test the accuracy of self-serving and conclusory assertions by a party seeking immunity. *See*, *e.g.*, *Funk v. Belneftekhim*, 861 F.3d 354, 358 (2d Cir. 2017) (district court had properly ordered jurisdictional discovery against Defendant entities

that claimed to be protected by FSIA as agencies or instrumentalities of government of Belarus, and properly sanctioned those entities for failure to provide discovery). *See also Filus v. Lot Polish Airlines*, 907 F.2d 1328 (2d Cir. 1990) (discussing potential need on remand to require Soviet government to respond to interrogatories; no dispute that USSR was a "foreign state" under FSIA but a fuller record might be needed to establish whether a relevant exception to FSIA immunity applied); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp.2d 765, 823 (S.D.N.Y. 2005) (ordering jurisdictional discovery against Saudi bank that claimed to be protected by FSIA as agency or instrumentality of Saudi government).

Here, the District Court simply waved away publicly-available evidence inconsistent with its conclusion, such as for example the UN's own organizational chart showing that UNWRA was not a "subsidiary organ." Supra at 38-40. Instead, the District Court seems to have credited an updated organizational chart only generated while this litigation was pending and almost certainly in response to it that changed the prior chart to reclassify UNRWA as a "subsidiary organ" after that label became tactically useful to the Defendants. *Ibid.*

Treating the new version as more credible than its predecessor was obvious error without discovery into the motives for the change, and it is clear that more evidence that may well contradict the Defendants' claims could plausibly be uncovered by discovery. Similarly, no weight could be given to the claims that Lazzarini and Grandi have the "rank" of Under-Secretary-General without discovery probing what that does – and doesn't – actually mean.

## CONCLUSION

For the foregoing reasons, the Dismissal Decision should be reversed in its entirety.

Dated: New York, New York
January 22, 2026

AMINI LLC

By *___/s/ Avery Samet___________*
Bijan Amini
Avery Samet
John W. Brewer
131 West 35th Street, 12th Floor
New York, New York 10001
Tel. (212) 490-4700
bamini@amnillc.com
asamet@aminillc.com
jbrewer@aminillc.com

MM~LAW LLC

By ___*/s/ Gavriel Mairone*_______
Gavriel Mairone
Chicago, Illinois 60611
Tel. (312) 253-7444

*Attorneys for Plaintiffs-Appellants*

Of Counsel:
Mark Sunshine, Esq.
Thomas Berner, Esq.

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(g), I certify that:

This brief complies with the type-two volume limitation of Local Rule 32.1(a)(4)(A) because it contains 13,553 words, excluding the items exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rule Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Avery Samet*

# SPECIAL APPENDIX

**Table of Contents**

**Page**

§ 288 "International organization" defined; authority of President, 22 USCA § 288 ........ SPA1

§ 288a. Privileges, exemptions, and immunities of international organizations, 22 USCA § 288a ........ SPA7

§ 288d. Privileges, exemptions, and immunities of officers, employees, and their families; waiver, 22 USCA § 288d ........ SPA9

§ 288e. Personnel entitled to benefits, 22 USCA § 288e ........ SPA10

Convention of Privileges and Immunities of the United Nations No.4 ........ SPA11

Opinion and Order of the Honorable Analisa Torres, dated September 30, 2025 ........ SPA23

Judgment of the United States District Court, Southern District of New York, entered September 30, 2025 ........ SPA51

22 U.S.C.A. § 288

# § 288. "International organization" defined; authority of President

Currentness

For the purposes of this subchapter, the term "international organization" means a public international organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation, and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in this subchapter. The President shall be authorized, in the light of the functions performed by any such international organization, by appropriate Executive order to withhold or withdraw from any such organization or its officers or employees any of the privileges, exemptions, and immunities provided for in this subchapter (including the amendments made by this subchapter) or to condition or limit the enjoyment by any such organization or its officers or employees of any such privilege, exemption, or immunity. The President shall be authorized, if in his judgment such action should be justified by reason of the abuse by an international organization or its officers and employees of the privileges, exemptions, and immunities provided in this subchapter or for any other reason, at any time to revoke the designation of any international organization under this section, whereupon the international organization in question shall cease to be classed as an international organization for the purposes of this subchapter.

## CREDIT(S)

(Dec. 29, 1945, c. 652, Title I, § 1, 59 Stat. 669.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NOS. 9721 AND 10103

Ex. Ord. No. 9721, May 10, 1946, 11 F.R. 5209, as amended by Ex. Ord. No. 10103, Feb. 1, 1950, 15 F.R. 597, which provided for the transfer of Federal Government personnel to public international organizations, was revoked with certain savings provisions by section 2 of Ex. Ord. No. 10804, Feb. 12, 1959, 24 F.R. 1147, and subsequently revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

## EXECUTIVE ORDERS

### Public International Organizations Entitled to Enjoy Certain Privileges, Exemptions, and Immunities

International organizations were designated by executive order as public international organizations entitled to enjoy the privileges, exemptions, and immunities conferred by the International Organizations Immunities Act (this subchapter) as follows:

African Development Bank, Ex. Ord. No. 12403, Feb. 8, 1983, 48 F.R. 6087.

African Development Fund, Ex. Ord. No. 11977, Mar. 14, 1977, 42 F.R. 14671.

African Union, Ex. Ord. No. 13377, Apr. 13, 2005, 70 F.R. 20263.

Asian Development Bank, Ex. Ord. No. 11334, Mar. 7, 1967, 32 F.R. 3933.

Border Environment Cooperation Commission, Ex. Ord. No. 12904, Mar. 16, 1994, 59 F.R. 13179.

Caribbean Organization, Ex.Ord. No. 10983, Dec. 30, 1961, 27 F.R. 32.

Commission for Environmental Cooperation, Ex. Ord. No. 12904, Mar. 16, 1994, 59 F.R. 13179.

Commission for Labor Cooperation, Ex. Ord. No. 12904, Mar. 16, 1994, 59 F.R. 13179.

Commission for the Study of Alternatives to the Panama Canal, Ex.Ord. No. 12567, Oct. 2, 1986, 51 F.R. 35495.

Customs Cooperation Council, Ex. Ord. No. 11596, June 5, 1971, 36 F.R. 11079.

Council of Europe in Respect of the Group of States Against Corruption, Ex. Ord. No. 13240, Dec. 18, 2001, 66 F.R. 66257.

European Bank for Reconstruction and Development, Ex. Ord. No. 12766, June 18, 1991, 56 F.R. 28463.

European Central Bank, Ex. Ord. No. 13307, May 29, 2003, 68 F.R. 33338.

European Space Agency [formerly European Space Research Organization (ESRO)], Ex. Ord. No. 11318, Dec. 5, 1966, 31 F.R. 15307; Ex. Ord. No. 11351, May 22, 1967, 32 F.R. 7511; Ex. Ord. No. 11760, Jan. 17, 1974, 39 F.R. 2343; Ex. Ord. No. 12766, June 18, 1991, 56 F.R. 28463.

Food and Agriculture Organization, Ex. Ord. No. 9698, Feb. 19, 1946, 11 F.R. 1809.

Global Fund To Fight AIDS, Tuberculosis and Malaria, Ex. Ord. No. 13395, Jan. 13, 2006, 71 F.R. 3203.

Great Lakes Fishery Commission, Ex. Ord. No. 11059, Oct. 23, 1962, 27 F.R. 10405.

Hong Kong Economic and Trade Offices, Ex. Ord. No. 13052, June 30, 1997, 62 F.R. 35659.

Inter-American Defense Board, Ex. Ord. No. 10228, Mar. 26, 1951, 16 F.R. 2676.

Inter-American Development Bank, Ex. Ord. No. 10873, Apr. 8, 1960, 25 F.R. 3097; Ex. Ord. No. 11019, Apr. 27, 1962, 27 F.R. 4145.

Inter-American Institute of Agricultural Sciences, Ex. Ord. No. 9751, July 11, 1946, 11 F.R. 7713.

Inter-American Investment Corporation, Ex. Ord. No. 12567, Oct. 2, 1986, 51 F.R. 35495.

Inter-American Statistical Institute, Ex. Ord. No. 9751, July 11, 1946, 11 F.R. 7713.

Inter-American Tropical Tuna Commission, Ex. Ord. No. 11059, Oct. 23, 1962, 27 F.R. 10405.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Intergovernmental Maritime Consultative Organization, Ex. Ord. No. 10795, Dec. 13, 1958, 23 F.R. 9709.

International Atomic Energy Agency, Ex. Ord. No. 10727, Aug. 31, 1957, 22 F.R. 7099.

International Bank for Reconstruction and Development, Ex. Ord. No. 9751, July 11, 1946, 11 F.R. 7713.

International Boundary and Water Commission, United States and Mexico, Ex. Ord. No. 12467, Mar. 2, 1984, 49 F.R. 8229.

International Centre for Settlement of Investment Disputes, Ex. Ord. No. 11966, Jan. 19, 1977, 42 F.R. 4331.

International Civil Aviation Organization, Ex. Ord. No. 9863, May 31, 1947, 12 F.R. 3559.

International Civilian Office in Kosovo, Ex. Ord. No. 13568, Mar. 8, 2011, 76 F.R. 13497.

International Coffee Organization, Ex. Ord. No. 11225, May 22, 1965, 30 F.R. 7093.

International Committee of the Red Cross, Ex. Ord. No. 12643, June 23, 1988, 53 F.R. 24247.

International Cotton Advisory Committee, Ex. Ord. No. 9911, Dec. 19, 1947, 12 F.R. 8719.

International Cotton Institute, Ex. Ord. No. 11283, May 27, 1966, 31 F.R. 7667.

International Criminal Police Organization (INTERPOL) (limited privileges), Ex. Ord. No. 12425, June 16, 1983, 48 F.R. 28069; Ex. Ord. No. 12971, Sept. 15, 1995, 60 F.R. 48617; Ex. Ord. No. 13524, Dec. 16, 2009, 74 F.R. 67803.

International Development Association, Ex. Ord. No. 11966, Jan. 19, 1977, 42 F.R. 4331.

International Development Law Institute, Ex. Ord. No. 12842, Mar. 29, 1993, 58 F.R. 17081.

International Fertilizer Development Center, Ex. Ord. No. 11977, Mar. 14, 1977, 42 F.R. 14671.

International Finance Corporation, Ex. Ord. No. 10680, Oct. 2, 1956, 21 F.R. 7647.

International Food Policy Research Institute (limited privileges), Ex. Ord. No. 12359, Apr. 22, 1982, 47 F.R. 17791.

International Fund for Agricultural Development, Ex. Ord. No. 12732, Oct. 31, 1990, 55 F.R. 46489.

International Hydrographic Bureau, Ex. Ord. No. 10769, May 29, 1958, 23 F.R. 3801.

International Joint Commission--United States and Canada, Ex. Ord. No. 9972, June 25, 1948, 13 F.R. 3573.

International Labor Organization, Ex. Ord. No. 9698, Feb. 19, 1946, 11 F.R. 1809.

International Maritime Satellite Organization, Ex. Ord. No. 12238, Sept. 12, 1980, 45 F.R. 60877.

International Monetary Fund, Ex. Ord. No. 9751, July 11, 1946, 11 F.R. 7713.

International Pacific Halibut Commission, Ex. Ord. No. 11059, Oct. 23, 1962, 27 F.R. 10405.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

International Renewable Energy Agency, Ex. Ord. No. 13705, Sept. 3, 2015, 80 F.R. 54405.

International Secretariat for Volunteer Service, Ex. Ord. No. 11363, July 20, 1967, 32 F.R. 10779.

International Telecommunication Union, Ex. Ord. No. 9863, May 31, 1947, 12 F.R. 3559.

International Telecommunications Satellite Organization (INTELSAT), Ex. Ord. No. 11718, May 14, 1973, 38 F.R. 12797; Ex. Ord. No. 11966, Jan. 19, 1977, 42 F.R. 4331.

International Union for Conservation of Nature and Natural Resources, Ex. Ord. No. 12986, Jan. 18, 1996, 61 F.R. 1693.

International Wheat Advisory Committee (International Wheat Council), Ex. Ord. No. 9823, Jan. 24, 1947, 12 F.R. 551.

Interparliamentary Union, Ex. Ord. No. 13097, Aug. 7, 1998, 63 F.R. 43065.

Israel-United States Binational Industrial Research and Development Foundation, Ex. Ord. No. 12956, Mar. 13, 1995, 60 F.R. 14199.

ITER International Fusion Energy Organization, Ex. Ord. No. 13451, Nov. 19, 2007, 72 F.R. 65653.

Korean Peninsula Energy Development Organization, Ex. Ord. No. 12997, Apr. 1, 1996, 61 F.R. 14949.

Multilateral Investment Guarantee Agency, Ex. Ord. No. 12647, Aug. 2, 1988, 53 F.R. 29323.

Multinational Force and Observers, Ex. Ord. No. 12359, Apr. 22, 1982, 47 F.R. 17791.

North American Development Bank, Ex. Ord. No. 12904, Mar. 16, 1994, 59 F.R. 13179.

North Pacific Anadromous Fish Commission, Ex. Ord. No. 12895, Jan. 26, 1994, 59 F.R. 4239.

North Pacific Marine Science Organization, Ex. Ord. No. 12894, Jan. 26, 1994, 59 F.R. 4237.

Office of the High Representative in Bosnia and Herzegovina, Ex. Ord. No. 13568, Mar. 8, 2011, 76 F.R. 13497.

Organization for European Economic Cooperation (now known as the Organization for Economic Cooperation and Development), Ex. Ord. No. 10133, June 27, 1950, 15 F.R. 4159.

Organization for the Prohibition of Chemical Weapons, Ex. Ord. No. 13049, June 11, 1997, 62 F.R. 32471.

[Organization of African Unity (OAU), Ex. Ord. No. 11767, Feb. 19, 1974, 39 F.R. 6603. Revoked by Ex. Ord. No. 13377, April 13, 2005, 70 F.R. 20263.]

Organization of American States (includes Pan American Union), Ex. Ord. No. 10533, June 3, 1954, 19 F.R. 3289.

Organization of Eastern Caribbean States, Ex. Ord. No. 12669, Feb. 20, 1989, 54 F.R. 7753.

Pacific Salmon Commission, Ex. Ord. No. 12567, Oct. 2, 1986, 51 F.R. 35495.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Pan American Health Organization (includes Pan American Sanitary Bureau), Ex. Ord. No. 10864, Feb. 18, 1960, 25 F.R. 1507.

Preparatory Commission of the International Atomic Energy Agency, Ex. Ord. No. 10727, Aug. 31, 1957, 22 F.R. 7099.

Provisional Intergovernmental Committee for the Movement of Migrants from Europe (now known as the Intergovernmental Committee for European Migration), Ex. Ord. No. 10335, Mar. 28, 1952, 17 F.R. 2741.

South Pacific Commission, Ex. Ord. No. 10086, Nov. 25, 1949, 14 F.R. 7147.

United International Bureau for the Protection of Intellectual Property (BIRPI), Ex. Ord. No. 11484, Sept. 29, 1969, 34 F.R. 15337.

United Nations, Ex. Ord. No. 9698, Feb. 19, 1946, 11 F.R. 1809.

United Nations Educational, Scientific, and Cultural Organization, Ex. Ord. No. 9863, May 31, 1947, 12 F.R. 3559.

United Nations Industrial Development Organization, Ex. Ord. No. 12628, Mar. 8, 1988, 53 F.R. 7725.

United States-Mexico Border Health Commission, Ex. Ord. No. 13367, Dec. 21, 2004, 69 F.R. 77605.

Universal Postal Union, Ex. Ord. No. 10727, Aug. 31, 1957, 22 F.R. 7099.

World Health Organization, Ex. Ord. No. 10025, Dec. 30, 1948, 13 F.R. 9361.

World Intellectual Property Organization, Ex. Ord. No. 11866, June 18, 1975, 40 F.R. 26015.

World Meteorological Organization, Ex. Ord. No. 10676, Sept. 1, 1956, 21 F.R. 6625.

World Organisation for Animal Health, Ex. Ord. No. 13759, January 12, 2017, 82 F.R. 5323.

World Tourism Organization, Ex. Ord. No. 12508, Mar. 22, 1985, 50 F.R. 11837.

World Trade Organization, Ex. Ord. No. 13042, Apr. 9, 1997, 50 F.R. 28301.

Public International Organizations Formerly Entitled To Enjoy Certain Privileges, Exemptions, and Immunities

Executive orders designating international organizations as public international organizations entitled to enjoy the privileges, exemptions, and immunities conferred by the International Organizations Immunities Act (this subchapter) were revoked as follows:

Caribbean Commission, Ex. Ord. No. 10025, Dec. 30, 1948, 13 F.R. 9361; revoked by Ex. Ord. No. 10983, Dec. 30, 1961, 27 F.R. 32.

Coffee Study Group, Ex. Ord. No. 10943, May 19, 1961, 26 F.R. 4419; revoked by Ex. Ord. No. 12033, Jan. 10, 1978, 43 F.R. 1915.

Inter-American Coffee Board, Ex. Ord. No. 9751, July 11, 1946, 11 F.R. 7713; revoked by Ex. Ord. No. 10083, Oct. 10, 1949, 14 F.R. 6161.

Intergovernmental Committee on Refugees, Ex. Ord. No. 9823, Jan. 24, 1947, 12 F.R. 551; revoked by Ex. Ord. No. 10083, Oct. 10, 1949, 14 F.R. 6161.

Interim Communications Satellite Committee, Ex. Ord. No. 11227, June 2, 1965, 30 F.R. 7369; revoked by Ex. Ord. No. 11718, May 14, 1973, 38 F.R. 12797.

International Refugee Organization, Ex. Ord. No. 9887, Aug. 22, 1947, 12 F.R. 5723; revoked by Ex. Ord. No. 10832, Aug. 18, 1959, 24 F.R. 6753.

International Telecommunications Satellite Consortium, Ex. Ord. No. 11277, Apr. 30, 1966, 31 F.R. 6609; revoked by Ex. Ord. No. 11718, May 14, 1973, 38 F.R. 12797.

Lake Ontario Claims Tribunal, Ex. Ord. No. 11372, Sept. 18, 1967, 32 F.R. 13251; revoked by Ex. Ord. No. 11439, Dec. 7, 1968, 33 F.R. 18257.

Organization of African Unity (OAU), Ex. Ord. No. 11767, Feb. 19, 1974, 39 F.R. 6603; revoked by Ex. Ord. No. 13377, Apr. 13, 2005, 70 F.R. 20263.

Southeast Asia Treaty Organization, Ex. Ord. No. 10866, Feb. 20, 1960, 25 F.R. 1584; revoked by Ex. Ord. No. 12033, Jan. 10, 1978, 43 F.R. 1915.

United Nations Relief and Rehabilitation Administration, Ex. Ord. No. 9698, Feb. 19, 1946, 11 F.R. 1809; revoked by Ex. Ord. No. 10083, Oct. 10, 1949, 14 F.R. 6161.

Notes of Decisions (32)

22 U.S.C.A. § 288, 22 USCA § 288
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 22. Foreign Relations and Intercourse
Chapter 7. International Bureaus, Congresses, Etc. (Refs & Annos)
Subchapter XVIII. Privileges and Immunities of International Organizations (Refs & Annos)

22 U.S.C.A. § 288a

# § 288a. Privileges, exemptions, and immunities of international organizations

Currentness

International organizations shall enjoy the status, immunities, exemptions, and privileges set forth in this section, as follows:

**(a)** International organizations shall, to the extent consistent with the instrument creating them, possess the capacity--

**(i)** to contract;

**(ii)** to acquire and dispose of real and personal property;

**(iii)** to institute legal proceedings.

**(b)** International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

**(c)** Property and assets of international organizations, wherever located and by whomsoever held, shall be immune from search, unless such immunity be expressly waived, and from confiscation. The archives of international organizations shall be inviolable.

**(d)** Insofar as concerns customs duties and internal-revenue taxes imposed upon or by reason of importation, and the procedures in connection therewith; the registration of foreign agents; and the treatment of official communications, the privileges, exemptions, and immunities to which international organizations shall be entitled shall be those accorded under similar circumstances to foreign governments.

**CREDIT(S)**

(Dec. 29, 1945, c. 652, Title I, § 2, 59 Stat. 669.)

Notes of Decisions (56)

22 U.S.C.A. § 288a, 22 USCA § 288a
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

22 U.S.C.A. § 288d

# § 288d. Privileges, exemptions, and immunities of officers, employees, and their families; waiver

Currentness

**(a)** Persons designated by foreign governments to serve as their representatives in or to international organizations and the officers and employees of such organizations, and members of the immediate families of such representatives, officers, and employees residing with them, other than nationals of the United States, shall, insofar as concerns laws regulating entry into and departure from the United States, alien registration and fingerprinting, and the registration of foreign agents, be entitled to the same privileges, exemptions, and immunities as are accorded under similar circumstances to officers and employees, respectively, of foreign governments, and members of their families.

**(b)** Representatives of foreign governments in or to international organizations and officers and employees of such organizations shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees except insofar as such immunity may be waived by the foreign government or international organization concerned.

**CREDIT(S)**

(Dec. 29, 1945, c. 652, Title I, § 7(a), (b), 59 Stat. 671.)

Notes of Decisions (29)

22 U.S.C.A. § 288d, 22 USCA § 288d
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

22 U.S.C.A. § 288e

# § 288e. Personnel entitled to benefits

Currentness

**(a) Notification to and acceptance by Secretary of State of personnel**

No person shall be entitled to the benefits of this subchapter, unless he (1) shall have been duly notified to and accepted by the Secretary of State as a representative, officer, or employee; or (2) shall have been designated by the Secretary of State, prior to formal notification and acceptance, as a prospective representative, officer, or employee; or (3) is a member of the family or suite, or servant, of one of the foregoing accepted or designated representatives, officers, or employees.

**(b) Deportation of undesirables**

Should the Secretary of State determine that the continued presence in the United States of any person entitled to the benefits of this subchapter is not desirable, he shall so inform the foreign government or international organization concerned, as the case may be, and after such person shall have had a reasonable length of time, to be determined by the Secretary of State, to depart from the United States, he shall cease to be entitled to such benefits.

**(c) Extent of diplomatic status**

No person shall, by reason of the provisions of this subchapter, be considered as receiving diplomatic status or as receiving any of the privileges incident thereto other than such as are specifically set forth herein.

**CREDIT(S)**

(Dec. 29, 1945, c. 652, Title I, § 8, 59 Stat. 672.)

22 U.S.C.A. § 288e, 22 USCA § 288e
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

## No. 4

---

# CONVENTION ON THE PRIVILEGES AND IMMUNITIES OF THE UNITED NATIONS

## Adopted by the General Assembly of the United Nations on 13 February 1946

*Official texts in English and in French. This Convention was registered ex officio by the Secretariat of the United Nations on 14 December 1946.*

---

# CONVENTION SUR LES PRIVILÈGES ET IMMUNITÉS DES NATIONS UNIES

## Approuvée par l'Assemblée générale des Nations Unies le 13 février 1946

*Textes officiels anglais et français. Cette Convention a été enregistrée d'office par le Secrétariat de l'Organisation des Nations Unies le 14 décembre 1946.*

# No. 4. CONVENTION[1] ON THE PRIVILEGES AND IMMUNITIES OF THE UNITED NATIONS, ADOPTED BY THE GENERAL ASSEMBLY OF THE UNITED NATIONS ON 13 FEBRUARY 1946

*Whereas* Article 104 of the Charter of the United Nations provides that the Organization shall enjoy in the territory of each of its Members such legal capacity as may be necessary for the exercise of its functions and the fulfilment of its purposes and

*Whereas* Article 105 of the Charter of the United Nations provides that the Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes and that representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization.

*Consequently* the General Assembly by a Resolution adopted on the 13 February 1946, approved the following Convention and proposed it for accession by each Member of the United Nations.

## *Article I*

### Juridical Personality

Section 1. The United Nations shall possess juridical personality. It shall have the capacity:

(*a*) To contract;

(*b*) To acquire and dispose of immovable and movable property;

(*c*) To institute legal proceedings.

## *Article II*

### Property, Funds and Assets

Section 2. The United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of

[1] Came into force (see page 263 of this volume) on 17 September 1946 as regards United Kingdom of Great Britain and Northern Ireland by the deposit of the instrument of accession.

legal process except insofar as in any particular case it has expressly waived its immunity shall extend to any particular case it has expressly waived its immunity. It is, however, understood that no waiver of immunity shall extend to any measure of execution.

SECTION 3. The premises of the United Nations shall be inviolable. The property and assets of the United Nations, wherever located and by whomsoever held, shall be immune from search, requisition, confiscation, expropriation and any other form of interference, whether by executive, administrative, judicial or legislative action.

SECTION 4. The archives of the United Nations, and in general all documents belonging to it or held by it, shall be inviolable wherever located.

SECTION 5. Without being restricted by financial controls, regulations or moratoria of any kind,

(*a*) The United Nations may hold funds, gold or currency of any kind and operate accounts in any currency;

(*b*) The United Nations shall be free to transfer its funds, gold or currency from one country to another or within any country and to convert any currency held by it into any other currency.

SECTION 6. In exercising its rights under Section 5 above, the United Nations shall pay due regard to any representations made by the Government of any Member insofar as it is considered that effect can be given to such representations without detriment to the interests of the United Nations.

SECTION 7. The United Nations, its assets, income and other property shall be:

(*a*) Exempt from all direct taxes; it is understood, however, that the United Nations will not claim exemption from taxes which are, in fact, no more than charges for public utility services;

(*b*) Exempt from customs duties and prohibitions and restrictions on imports and exports in respect of articles imported or exported by the United Nations for its official use. It is understood, however, that articles imported under such exemption will not be sold in the country into which they were imported except under conditions agreed with the Government of that country;

(*c*) Exempt from customs duties and prohibitions and restrictions on imports and exports in respect of its publications.

SECTION 8. While the United Nations will not, as a general rule, claim exemption from excise duties and from taxes on the sale of movable and immovable property which form part of the price to be paid, nevertheless when the United Nations is making important purchases for official use of property on which such duties and taxes have been charged or are chargeable, Members will, whenever possible, make appropriate administrative arrangements for the remission or return of the amount of duty or tax.

## *Article III*

### FACILITIES IN RESPECT OF COMMUNICATIONS

SECTION 9. The United Nations shall enjoy in the territory of each Member for its official communications treatment not less favourable than that accorded by the Government of that Member to any other Government including its diplomatic mission in the matter of priorities, rates and taxes on mails, cables, telegrams, radiograms, telephotos, telephone and other communications; and press rates for information to the press and radio. No censorship shall be applied to the official correspondence and other official communications of the United Nations.

SECTION 10. The United Nations shall have the right to use codes and to despatch and receive its correspondence by courier or in bags, which shall have the same immunities and privileges as diplomatic couriers and bags.

## *Article IV*

### THE REPRESENTATIVES OF MEMBERS

SECTION 11. Representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations, shall, while exercising their functions and during the journey to and from the place of meeting, enjoy the following privileges and immunities:

(*a*) Immunity from personal arrest or detention and from seizure of their personal baggage, and, in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind;

(*a*) Inviolability for all papers and documents;

(*c*) The right to use codes and to receive papers or correspondence by courier or in sealed bags;

(*d*) Exemption in respect of themselves and their spouses from immigration restrictions, aliens registration or national service obligations in the state they are visiting or through which they are passing in the exercise of their functions;

(*e*) The same facilities in respect of currency or exchange restrictions as are accorded to representatives of foreign governments on temporary official missions;

(*f*) The same immunities and facilities in respect of their personal baggage as are accorded to diplomatic envoys, and also;

(*g*) Such other privileges, immunities and facilities not inconsistent with the foregoing as diplomatic envoys enjoy, except that they shall have no right to claim exemption from customs duties on goods imported (otherwise than as part of their personal baggage) or from excise duties or sales taxes.

SECTION 12. In order to secure, for the representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations, complete freedom of speech and independance in the discharge of their duties, the immunity from legal process in respect of words spoken or written and all acts done by them in discharging their duties shall continue to be accorded, notwithstanding that the persons concerned are no longer the representatives of Members.

SECTION 13. Where the incidence of any form of taxation depends upon residence, periods during which the representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations are present in a state for the discharge of their duties shall not be considered as periods of residence.

SECTION 14. Privileges and immunities are accorded to the representatives of Members not for the personal benefit of the individuals themselves, but in order to safeguard the independent exercise of their functions in connection with the United Nations. Consequently a Member not only has the right but is under a duty to waive the immunity of its representative in any case where in the opinion of the Member the immunity would impede the course of justice, and it can be waived without prejudice to the purpose for which the immunity is accorded.

SECTION 15. The provisions of Sections 11, 12 and 13 are not applicable as between a representative and the authorities of the state of which he is a national or of which he is or has been the representative.

SECTION 16. In this article the expression "representatives" shall be deemed to include all delegates, deputy delegates, advisers, technical experts and secretaries of delegations.

## *Article V*

### OFFICIALS

SECTION 17. The Secretary-General will specify the categories of officials to which the provisions of this Article and Article VII shall apply. He shall submit these categories to the General Assembly. Thereafter these categories shall be communicated to the Governments of all Members. The names of the officials included in these categories shall from time to time be made known to the Governments of Members.

SECTION 18. Officials of the United Nations shall:

(*a*) Be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity;

(*b*) Be exempt from taxation on the salaries and emoluments paid to them by the United Nations;

(*c*) Be immune from national service obligations;

(*d*) Be immune, together with their spouses and relatives dependent on them, from immigration restrictions and alien registration;

(*e*) Be accorded the same privileges in respect of exchange facilities as are accorded to the officials of comparable ranks forming part of diplomatic missions to the Government concerned;

(*f*) Be given, together with their spouses and relatives dependent on them, the same repatriation facilities in time of international crisis as diplomatic envoys;

(*g*) Have the right to import free of duty their furniture and effects at the time of first taking up their post in the country in question.

SECTION 19. In addition to the immunities and privileges specified in Section 18, the Secretary-General and all Assistant Secretaries-General shall be accorded in respect of themselves, their spouses and minor children, the

privileges and immunities, exemptions and facilities accorded to diplomatic envoys, in accordance with international law.

SECTION 20. Privileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves. The Secretary-General shall have the right and the duty to waive the immunity of any official in any case where, in his opinion, the immunity would impede the course of justice and can be waived without prejudice to the interests of the United Nations. In the case of the Secretary-General, the Security Counsil shall have the right to waive immunity.

SECTION 21. The United Nations shall co-operate at all times with the appropriate authorities of Members to facilitate the proper administration of justice, secure the observance of police regulations and prevent the occurrence of any abuse in connection with the privileges, immunities and facilities mentioned in this Article.

## *Article VI*

### EXPERTS ON MISSIONS FOR THE UNITED NATIONS

SECTION 22. Experts (other than officials coming within the scope of Article V) performing missions for the United Nations shall be accorded such privileges and immunities as are necessary for the independent exercise of their functions during the period of their missions, including the time spent on journeys in connection with their missions. In particular they shall be accorded:

(*a*) Immunity from personal arrest or detention and from seizure of their personal baggage;

(*b*) In respect of words spoken or written and acts done by them in the course of the performance of their mission, immunity from legal process of every kind. This immunity from legal process shall continue to be accorded notwithstanding that the persons concerned are no longer employed on missions for the United Nations;

(*c*) Inviolability for all papers and documents;

(*d*) For the purpose of their communications with the United Nations, the right to use codes and to receive papers or correspondence by courier or in sealed bags;

(*e*) The Same facilities in respect of currency or exchange restrictions as are accorded to representatives of foreign governments on temporary official missions;

(*f*) The same immunities and facilities in respect of their personal baggage as are accorded to diplomatic envoys.

SECTION 23. Privileges and immunities are granted to experts in the interests of the United Nations and not for the personal benefit of the individuals themselves. The Secretary-General shall have the right and the duty to waive the immunity of any expert in any case where, in his opinion, the immunity would impede the course of justice and it can be waived without prejudice to the interests of the United Nations.

## *Article VII*

### UNITED NATIONS LAISSEZ-PASSER

SECTION 24. The United Nations may issue United Nations laissez-passer to its officials. These laissez-passer shall be recognized and accepted as valid travel documents by the authorities of Members, taking into account the provisions of Section 25.

SECTION 25. Applications for visas (where required) from the holders of United Nations laissez-passer, when accompanied by a certificate that they are travelling on the business of the United Nations, shall be dealt with as speedily as possible. In addition, such persons shall be granted facilities for speedy travel.

SECTION 26. Similar facilities to those specified in Section 25 shall be accorded to experts and other persons who, though not the holders of United Nations laissez-passer, have a certificate that they are travelling on the business of the United Nations.

SECTION 27. The Secretary-General, Assistant Secretaries-General and Directors travelling on United Nations laissez-passer on the business of the United Nations shall be granted the same facilities as are accorded to diplomatic envoys.

SECTION 28. The provisions of this article may be applied to the comparable officials of specialized agencies if the agreements for relationship made under Article 63 of the Charter so provide.

### *Article VIII*

#### SETTLEMENTS OF DISPUTES

SECTION 29. The United Nations shall make provisions for appropriate modes of settlement of:

(*a*) Disputes arising out of contracts or other disputes of a private law character to which the United Nations is a party;

(*b*) Disputes involving any official of the United Nations who by reason of his official position enjoys immunity, if immunity has not been waived by the Secretary-General.

SECTION 30. All differences arising out of the interpretation or application of the present convention shall be referred to the International Court of Justice, unless in any case it is agreed by the parties to have recourse to another mode of settlement. If a difference arises between the United Nations on the one hand and a Member on the other hand, a request shall be made for an advisory opinion on any legal question involved in accordance with Article 96 of the Charter and Article 65 of the Statute of the Court. The opinion given by the Court shall be accepted as decisive by the parties.

### *Final Article*

SECTION 31. This convention is submitted to every Member of the United Nations for accession.

SECTION 32. Accession shall be affected by deposit of an instrument with the Secretary-General of the United Nations and the convention shall come into force as regards each Member on the date of deposit of each instrument of accession.

SECTION 33. The Secretary-General shall inform all Members of the United Nations of the deposit of each accession.

SECTION 34. It is understood that, when an instrument of accession is deposited on behalf of any Member, the Member will be in a position under its own law to give effect to the terms of this convention.

SECTION 35. This convention shall continue in force as between the United Nations and every Member which has deposited an instrument of accession for so long as that Member remains a Member of the United

Case: 25-2837, 01/22/2026, DktEntry: 29.1, Page 103 of 136




Nations, or until a revised general convention has been approved by the General Assembly and that Member has become a party to this revised convention.

SECTION 36. The Secretary-General may conclude with any Member or Members supplementary agreements adjusting the provisions of this convention so far as that Member or those Members are concerned. These supplementary agreements shall in each case be subject to the approval of the General Assembly.

# No. 4

## UNITED NATIONS and LEAGUE OF NATIONS

## Protocol (No. I) concerning the execution of various operations in the transfer to the United Nations of certain assets of the League of Nations. Signed at Geneva, on 1 August 1946

*French official text communicated by the Secretary-General of the United Nations. The filing and recording took place on 14 December 1946.*

## ORGANISATION DES NATIONS UNIES et SOCIETE DES NATIONS

## Protocole (No I) concernant l'exécution de diverses opérations de transfert de certains avoirs de la Société des Nations aux Nations Unies. Signé à Genève, le 1er août 1946

*Texte officiel français communiqué par le Secrétaire général de l'Organisation des Nations Unies. Le classement et l'inscription au répertoire ont eu lieu le 14 décembre 1946.*

TRANSLATION—TRADUCTION

# No. 4. PROTOCOL (NO. I) CONCERNING THE EXECUTION OF VARIOUS OPERATIONS IN THE TRANSFER TO THE UNITED NATIONS OF CERTAIN ASSETS OF THE LEAGUE OF NATIONS, SIGNED AT GENEVA ON 1 AUGUST 1946

Mr. Sean LESTER, Secretary-General of the League of Nations, and Mr. Wlodzimierz MODEROW, Director, Representative of the Secretary-General of the United Nations in Geneva:

*Note* that, in application of the Common Plan, approved by a resolution of the General Assembly of the United Nations, dated 12 February 1946, and by a resolution of the Assembly of the League of Nations, dated 18 April 1946, and of a subsequent Agreement[1] dated 19 July 1946, concerning the execution of the transfer to the United Nations of certain assets of the League of Nations, the following operations were effected on 1 August 1946:

1. The transfer of rights in respect of the League of Nations buildings and other immovable property was effected on 1 August 1946, and the necessary entries having been made this day in the Land Register of the Republic and Canton of Geneva.

2. The transfer of the ownership and possession of the movable property was also effected on 1 August 1946.

In accordance with Article 6 of the Agreement of 19 July 1946, the movable objects transferred have been listed in an inventory drawn up by the League of Nations which is in course of being verified by the United Nations. A protocol will be drawn up placing on record the completion of this operation.

3. A final valuation of the assets will be made in accordance with the terms of the Common Plan. It will be the subject of a special protocol.

(*Signed*) Sean LESTER

W. MODEROW

Geneva, 1 August 1946.

[1] See page 109 of this volume.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________________
DATE FILED: 9/30/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ESTATE OF O. S. T., BY HEIR-AT-LAW GAD KEDEM, GAD KEDEM, INDIVIDUALLY, REUMA KEDEM, TALIA BINER, ESTHER BINER, DITZA HEIMAN, NETA HEIMAN MINA, DAFNA SHAY HEIMAN, GIDEON HEIMAN GLATT, YASMIN BEN GIGI, MAAYAN ELIAZ, INDIVIDUALLY, ESTATE OF DIKLA ARAVA ELIAZ, BY HEIR-AT-LAWS ODIN ELIAZ AND STAV ELIAZ, ESTATE OF T.E., MINOR CHILD, BY HEIR-AT-LAW MAAYAN ELIAZ, ODIN ELIAZ, INDIVIDUALLY, STAV ARAVA ELIAZ, INDIVIDUALLY, DOV ELIAZ, YIFAT TANAMI, SAGI ARAVA, ALON ARAVA, HADAR BEN DAVID, LIAT KOPERSTEIN, YALI KOPERSTEIN, ZIV KOPERSTEIN, NAAMA KOPERSTEIN, GONI KOPERSTEIN AVNI, RAN AHARON AVNI, MAAYAN ZIN, INDIVIDUALLY, D.E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, E.E., MINOR CHILD, BY LEGAL GUARDIAN MAAYAN ZIN, MERAV TAL (TAL ALFASI), RACHEL ALFENDRI, TOMER TAL ALFASI, ORI TAL ALFASI, KEREN BLANK, SIGALIT SHARABI, VIKTOR RAHMILOV, GALINA RAHMILOV, INDIVIDUALLY, SOFIA HODEDATOV, SIGAL BENBENISTE, NATALI RAHMILOV, E.L.R, MINOR CHILD, BY LEGAL GUARDIAN GALINA RAHMILOV, TAMIR HODEDATOV, HANANEL BENBENISTE, EFIM SOLOMONOV, ESTATE OF YUVAL BAR-ON, BY HEIRS-AT-LAW ORIT BAR-ON AND ITZHAK BAR-ON, ORIT BAR-ON, INDIVIDUALLY, ITZHAK BAR-ON, INDIVIDUALLY, ESTATE OF MOSHE SHUVA, BY HEIR-AT-LAW YOSSEF SHUVA, YOSSEF SHUVA, INDIVIDUALLY, SONIA SHUVA, MAAYAN DEVIKO, SHIMON SHUVA, ESTATE OF DROR KAPLUN, BY HEIRS-AT-LAW NOAM KAPLUN, MAAYAN KAPLUN KEIDAR,

MORAN KAPLUN (TARASOV), NOAM KAPLUN, INDIVIDUALLY, MAAYAN KAPLUN KEIDAR, INDIVIDUALLY, MORAN KAPLUN (TARASOV), INDIVIDUALLY, ESTATE OF MARCEL FRAILICH, BY HEIRS-AT-LAW MOR FRIDA STRIKOVKI, ZIV FRAILICH, AMIT FRAILICH, MOR FRIDA STRIKOVSKI, INDIVIDUALLY, ZIV FRAILICH, INDIVIDUALLY, AMIT FRAILICH, INDIVIDUALLY, SHARON CASPI, AMIT CASPI, INDIVIDUALLY, NIV CASPI, MAY CASPI, S. C., MINOR CHILD, BY LEGAL GUARDIAN AMIT CASPI, ESTATE OF VARDA HARAMATY, BY HEIR-AT-LAW AYELET HARAMATI MIZRAHI, AYELET HARAMATI MIZRAHI, INDIVIDUALLY, AVRAHAM MIZRAHI, ITAMAR MIZRAHI, TOMER MIZRAHI, EDITH HYAMS, ASHER SABAG, MICHAL SABAG, DOR MICHAEL SABAG, DANNY OFER VAGE, INDIVIDUALLY, GAT VAGE, H. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, S. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, ESTATE OF MARK SHINDEL, BY HEIR-AT-LAW JULIA SHINDEL, JULIA SHINDEL, INDIVIDUALLY, IGOR SHINDEL, GUY SHINDEL, B. S., MINOR CHILD, BY LEGAL GUARDIAN JULIA SHINDEL, ESTATE OF YUVAL SALOMON, BY HEIR-AT-LAW DORON SALOMON, DORON SALOMON, INDIVIDUALLY, ESTATE OF GAYA HALIFA, BY HEIR-AT-LAW AVRAHAM HALIFA, AVRAHAM HALIFA, INDIVIDUALLY, SIGAL HALIFA, NOGA HALIFA, IDO HALIFA, IRIT LAHAV, TAMAR LAHAV, ELIYAHU HANAN BUCH, NITZAN LAHAV-PASTER, YAARA SZATMARI, ILAN LAHAV, GALIT LAHAV, INDIVIDUALLY, GUI LAHAV, R. L., MINOR CHILD, BY LEGAL GUARDIAN GALIT LAHAV, AND OMER LAHAV,

Plaintiffs,

| | |
|---|---|
| -against-<br><br>UNITED NATIONS RELIEF AND WORKS AGENCY ("UNRWA"), PHILIPPE LAZZARINI, PIERRE KRÄHENBÜHL, FILIPPO GRANDI, LENI STENSETH, SANDRA MITCHELL, MARGOT ELLIS, AND GRETA GUNNARSDOTTIR,<br><br>Defendants. | 24 Civ. 4765 (AT)<br><br>**OPINION AND ORDER** |

ANALISA TORRES, District Judge:

Plaintiffs, groups of foreign national families and estates, bring this action under the Alien Tort Statute, 28 U.S.C. § 1350, against Defendant, United Nations Relief and Works Agency ("UNRWA"), and individual Defendants, Philippe Lazzarini, Pierre Krähenbühl, Filippo Grandi, Leni Stenseth, Sandra Mitchell, Margot Ellis, and Greta Gunnarsdottir ("Individual Defendants"), alleging, among other claims, that UNRWA and the Individual Defendants knowingly aided and abetted torts committed by Hamas, a terrorist organization, on October 7, 2023 (the "October 7 Attack"), in violation of the law of nations and the treaties of the United States. *See generally* Compl., ECF No. 1. Certain Plaintiffs also claim that the Individual Defendants' actions to aid and abet Hamas resulted in extrajudicial killing or torture in violation of the Torture Victim Protection Act of 1991, Pub. L. 102–256, 106 Stat. 73. Compl. ¶¶ 10, 654–59. Defendants move to dismiss the complaint for lack of subject matter jurisdiction on the grounds of immunity and lack of personal jurisdiction. *See* Mot., ECF No. 49; Mem., ECF No. 50. For the reasons stated below, Defendants' motion is granted with prejudice.

## BACKGROUND

As part of a nearly century-long conflict between the Israeli and Palestinian people, on October 7, 2023, Hamas launched an attack in Gaza, killing approximately 1,200 individuals and taking about 250 hostages. Compl. ¶ 566. Plaintiffs have suffered extensively from the attack

and the ensuing conflict, including from the killing of family members, *see e.g.*, *id.* ¶¶ 20, 28, 124, from torture, *see e.g.*, *id.* ¶¶ 1, 166, from kidnapping, *see e.g.*, *id.* ¶¶ 69, 151, 155–56, 199, and from damaged homes, *see e.g.*, *id.* ¶¶ 20, 30. Nearly two years later, the conflict continues to take a humanitarian toll; according to some sources, including UNRWA, over 160,000 people have been injured in Gaza and the West Bank, and over 60,000 Palestinians have been killed. *See* UNRWA, Situation Rep. #188 on the Humanitarian Crisis in the Gaza Strip and the Occupied West Bank, Including East Jerusalem (Sept. 12, 2025), https://www.unrwa.org/resources/reports/unrwa-situation-report-188-situation-gaza-strip-and-west-bank-including-east-jerusalem.

Established in 1949 by the United Nations ("U.N.") General Assembly, UNRWA "provides education, health care (including mental health care), relief and social services, emergency assistance and microcredit to approximately five million Palestinians located in Gaza, the West Bank, Jordan, Lebanon, and Syria" and, accordingly, provided such relief following the October 7 Attack. Compl. ¶ 540; *see also* Mem. at 3, 12. Plaintiffs allege that, through these relief efforts, UNRWA and the Individual Defendants "systematically and deliberately aided and abetted" Hamas' terrorist activity. Compl. ¶ 543. Specifically, Plaintiffs claim that UNRWA knowingly facilitated and permitted the use of its facilities, such as schools, medical clinics, offices, and warehouses, for military and terrorist purposes, including the construction of Hamas command and control centers, attack tunnels, underground bunkers, weapons storage and deployment centers, and the installation of rocket launching platforms and terrorist firing positions. *Id.* ¶¶ 543, 545–62. Plaintiffs allege that despite public concern and internal U.N. objections, UNRWA continued to provide material assistance to Hamas by employing Hamas "operatives" in "influential positions" and "adopting" educational curricula that "incite[d]

antisemitism" and "indoctrinate[ed] . . . Palestinian children to support and participate in Hamas' jihadi culture," including "[t]he indoctrination of hatred of Jews and Israel." *Id.* ¶¶ 563–65, 572–86, 588–616. Plaintiffs also claim that UNRWA staff included Hamas members, some of whom participated in the October 7 Attack and in the holding and torture of hostages. *Id.* ¶¶ 566–71; *see also id.* ¶ 587 (claiming that Individual Defendants "knew Hamas controlled UNRWA's staff union in Gaza" since 2009) (capitalization altered). According to Plaintiffs, "[e]ach of the Individual Defendants, during their respective employment with UNRWA, directed and approved of these acts and omissions by UNRWA, while well aware of Hamas' intention to use its terror infrastructure to commit genocide and other crimes against humanity against Israeli civilians." *Id.* ¶ 544.

Plaintiffs filed this action on June 24, 2024. *See generally id.* On July 30, 2024, at the request of the U.N. and "in accordance with the United States' treaty obligations," the United States Government filed a statement of interest asking the Court to respect the immunities of the U.N. and its officials under 28 U.S.C. § 517. Govt. Ltr. I, ECF No. 17. The Government argued that "because the [U.N.] has not waived its immunity in this case, its subsidiary organ, UNRWA, continues to enjoy absolute immunity from suit, and this action should be dismissed as against . . . UNRWA for lack of subject matter jurisdiction." *Id.* at 6; *see also* U.N. Ltr. I, ECF No. 17-1 (June 26, 2024, U.N. letter invoking Defendants' immunity); U.N. Ltr. II, ECF No. 17-2 (July 17, 2025, U.N. letter further invoking Defendants' immunity). The Government also contended that "Lazzarini and Grandi enjoy diplomatic immunity" under the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, *entered into force with respect to the United States* Dec. 13, 1972, 23 U.S.T. 3227, and that the Individual Defendants "enjoy immunity for their official acts" under the International Organizations Immunity Act, 22 U.S.C. § 288d(b). Govt. Ltr. I at

6–7 (capitalization altered). The Government has since changed its position, and now argues in its April 24, 2025 statement of interest that UNRWA is not an organ of the U.N. and thus not immune from suit, and, as a result, neither are the Individual Defendants who might be afforded official-act immunity. Govt. Ltr. II at 3, 9, ECF No. 59.

The Court has also received two amicus briefs on the issue of Defendants' immunity. The first brief was submitted by the StandWithUs Saidoff Legal Department, a division of StandWithUs ("StandWithUs"); the Raoul Wallenberg Centre for Human Rights; the Endowment for Middle East Truth; the National Jewish Advocacy Center, Inc.; and the Temple Beth El of Boca Raton. *See* StandWithUs Br., ECF No. 35. The second brief was submitted by Advancing American Freedom ("AAF"), Keith Alexander, Victoria Coates, Bonnie Glick, Mark Goldfeder, Eugene Kontorovich, Michael Mukasey, Jeremy Rabkin, and Kevin Roberts. *See* AAF Br., ECF No. 37-1; *see also* ECF No. 39.

Before the Court is Defendants' motion to dismiss Plaintiffs' complaint on the ground that Defendants are immune from suit. Mot.; *see also* Mem.; Opp., ECF No. 53; Reply, ECF No. 55; Def. Imm. Ltr., ECF No. 46 (Nov. 14, 2024 letter invoking Defendants' immunity).

## DISCUSSION

### I. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(1), an action must be dismissed when the Court lacks subject matter jurisdiction—that is, the statutory or constitutional power to adjudicate the case. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). The Court must resolve subject matter jurisdiction as a "threshold matter" before reaching the merits of the case. *Chau v. Sec. & Exch. Comm'n*, 665 F. App'x 67, 70 (2d Cir. 2016); *see also Bolivarian Rep. of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017). A plaintiff must "affirmatively

demonstrate [subject matter jurisdiction] by a preponderance of the evidence." *Chau*, 665 F. App'x at 70. Although the Court must "take all facts alleged in the complaint as true and draw all reasonable inferences" in a plaintiff's favor, *id.*, a sufficient basis for jurisdiction still "must be shown affirmatively," and that showing cannot be made solely by asking the Court to draw inferences from the pleadings. *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). Additionally, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

II. UNRWA's Immunity

Defendants argue that UNRWA is entitled to "absolute immunity from the jurisdiction of U.S. courts" under the Convention on the Privileges and Immunities of the United Nations ("CPIUN") and the International Organizations Immunities Act ("IOIA"). Mem. at 9, 16. The Government, in its first statement of interest, agreed with Defendants. *See generally* Govt. Ltr. I. Plaintiffs contend that UNRWA is not immune from suit—neither under the CPIUN nor IOIA. Opp. at 6-16. Both the Government, in its second statement of interest, Gov. Ltr. II, and amici agree with Plaintiffs. *See* AAF Br.; StandWithUs Br. The Court first addresses the issue of immunity under the CPIUN.

A. The Convention on the Privileges and Immunities of the United Nations

1. Legal Standard

The scope of immunity afforded to the U.N. and its subsidiary bodies comes from two multilateral agreements to which the United States is a party: the Charter of the United Nations ("U.N. Charter") and the CPIUN, Feb. 13, 1946, *entered into force with respect to the United States*, Apr. 29, 1970, 21 U.S.T. 1418. Under Article 105 of the U.N. Charter, the U.N., and by

extension, the "[r]epresentatives of the Members of the United Nations and officials of the [U.N.,] . . . shall enjoy such privileges and immunities as are necessary for the fulfillment of [the U.N.'s] purposes." U.N. Charter art. 105, paras. 1–2 (June 26, 1945). Article 22 of the U.N. Charter authorizes the General Assembly to "establish such subsidiary organs as it deems necessary for the performance of its functions." *Id.* art. 22.

The CPIUN further articulates the U.N.'s privileges and immunities, providing that "[t]he [U.N.], its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity." CPIUN art. II, § 2. Because the CPIUN is a "self-executing" treaty, it "applies in American courts without implementing legislation" and is "binding on the United States as a matter of international law." *See Brzak v. United Nations*, 597 F.3d 107, 111–12 (2d Cir. 2010). Accordingly, unless immunity is expressly waived, the CPIUN affords absolute immunity to the U.N., and a "district court's decision to dismiss the claims against the [U.N.]" absent a waiver of immunity is "correct." *Brzak*, 597 F.3d at 112.

The CPIUN extends its grant of absolute immunity to "subsidiary organs of the [U.N.]." *See* CPIUN art. IV, § 11 ("[S]ubsidiary organs of the [U.N.] . . . shall, while exercising their functions . . . enjoy . . . in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind."). The Court, therefore, lacks subject matter jurisdiction over subsidiary bodies of the U.N., as they are "also immune from suit." *Georges v. United Nations*, 84 F. Supp. 3d 246, 249 (S.D.N.Y. 2015), *aff'd*, 834 F.3d 88 (2d Cir. 2016).

When the Government, through the Department of Justice, submits a statement of interest in a case involving an international treaty, "[r]espect is ordinarily due the reasonable views of the

Executive Branch." *Georges*, 84 F. Supp. 3d at 250 (quoting *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999) (alterations in original)); *see also* 28 U.S.C. § 517 ("The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."). But the Government's views "concerning the meaning of an international treaty" are "not conclusive," and a Court must still evaluate whether they are "faithful to the [treaty's] text, purpose, and overall structure." *El Al Israel Airlines, Ltd.*, 525 U.S. at 168–169 (citing *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–185 (1982)). Ultimately, the "plain and unambiguous text of the CPIUN," which "grants the U.N. [and its subsidiaries] absolutely immunity 'from every form of legal process' unless it has so waived," controls. *Sadikoglu v. United Nations Dev. Programme*, No. 11 Civ. 294, 2011 WL 4953994, at *3 (S.D.N.Y. Oct. 14, 2011); *see also Medellin v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."); *Devi v. Silva*, 861 F. Supp. 2d 135, 140–141 (S.D.N.Y. 2012) ("At least where the basis for diplomatic immunity is clearly established, there is no need for a formal suggestion of immunity by the United States.").[1]

2. Burden of Proof

Who bears the burden of proving UNRWA's immunity under the CPIUN? Defendants argue that the burden lies with Plaintiffs because the issue of immunity relates to subject matter jurisdiction, which Plaintiffs must ultimately prove by a preponderance of the evidence, especially when, as here, the U.N. has not waived immunity for itself, its subsidiary organs, or its

[1] Accordingly, the Court considers amicus briefs as only "persuasive authority." *Commodity Futures Trading Comm'n v. Archegos Cap. Mgmt. LP*, No. 22 Civ. 3401, 2023 WL 6123102, at *3 n.5 (S.D.N.Y. Sept. 19, 2023).

officials. *See* Mem. at 7–8; Reply at 2–3. Plaintiffs contend that when statute-based immunity is not involved under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, common law sovereign immunity governs the exercise of the Court's subject matter jurisdiction. Pl. Resp. Ltr. II at 5–6, ECF No. 67 (quoting *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 271 (2023)). Plaintiffs argue, therefore, that Defendants bear the ultimate burden of proving UNRWA's immunity. Pl. Resp. Ltr. II at 6.

Immunity under the CPIUN is treaty-based, binding international law on the courts; it is not based on common law. *See Brzak*, 597 F.3d at 111–12. Common law immunity is "immunity that foreign states enjoyed prior to the enactment of the FSIA," *Havlish v. Taliban*, No. 23 Civ. 258, 2025 WL 2447193, at *23 (2d Cir. Aug. 26, 2025), and does not bear on the CPIUN's grant of absolute immunity to the U.N. and its subsidiaries, *Brzak*, 597 F.3d at 111–12. Accordingly, UNRWA's CPIUN-based immunity presents a first-order question of the Court's subject matter jurisdiction, and Plaintiffs bear the burden of proving that it exists.

3. UNRWA as a Subsidiary Organ

Defendants contend that UNRWA is a subsidiary organ of the U.N. General Assembly, one of the U.N.'s six principal organs, and therefore enjoys immunity under the CPIUN. Mem. at 10–11. Defendants rely on the Government's first statement of interest and the letters submitted by the U.N. to support their argument, *see* Mem. at 11–12; *see also* Govt. Ltr. I at 4–6; U.N. Ltr. I at 2–3; U.N. Ltr. II at 2; Govt. Reply Ltr. I at 2–4, and various U.N. documents, including General Assembly Resolutions and the U.N.'s Repertory of Practice of United Nations Organs, which describe "UNRWA's status as a subsidiary organ," *see* Mem. at 12. Defendants

further rely on a legal opinion of the U.N. Office of Legal Affairs, which "confirm[s] that UNRWA is entitled to immunity under the CPIUN." *Id.* at 13.

Plaintiffs and StandWithUs amici argue that UNRWA is not a subsidiary organ but is only "affiliated" with the U.N.—an insufficient basis for treaty-based immunity. *See* Pl. Resp. Ltr. I at 2–3, 8, 11–14; Compl. ¶ 507; *see also* Brewer Decl. Ex. E ¶ 17, ECF No. 24-5; StandWithUs Br. at 5–6. In support, Plaintiffs cite the formation history of the CPIUN—noting that a separate treaty, the Convention on the Privileges and Immunities of the Specialized Agencies ("CPISA"), which Plaintiffs contend would have provided immunity to U.N.-affiliated entities, was never ratified by the United States. Plaintiffs also argue that the fact that the 1949 resolution establishing UNRWA asked the world's governments to grant UNRWA immunity suggests "that UNRWA did not have immunity under the CPIUN." Pl. Resp. Ltr. I at 9; *see also* Opp. at 8; Pl. Resp. Ltr. II at 17–18.

Plaintiffs point to various U.N. documents and a U.N. website to claim that UNRWA is not a subsidiary organ of the U.N. but is instead a "specialized agency." Pl. Resp. Ltr. I at 10. These include: (1) "the official organizational chart of the entire 'United Nations System'" from the U.N.'s website that "lists a number of entities as 'subsidiary organs' but does not include UNRWA in that category, instead listing UNRWA in a separate miscellaneous category of 'Other Entities,'" Pl. Resp. Ltr. I at 11; Opp. at 8; Brewer Decl. Ex. D, ECF No. 24-4; (2) a "seemingly comprehensive list of 'Subsidiary Organs of the General Assembly'" from the U.N. website, Opp. at 8; Brewer Decl. II, Ex. S, ECF No. 52-1; and (3) the U.N. Juridical Yearbook for 2000, (the "Yearbook"), which states that because certain "subsidiary bodies [such as UNRWA] carry out much of their substantive work in the limited area of their mandated

activities, . . . their activities closely resemble those of specialized agencies," Brewer Decl. Ex. T, ECF No. 66-1, at 354–58; Pl. Resp. Ltr. II at 12–13.

Plaintiffs also state that the U.N.'s letter inviting the Government to file a statement of interest concerning its immunity does not explicitly characterize UNRWA as a subsidiary organ. Opp. at 7; Pl. Resp. Ltr. I at 11. Finally, Plaintiffs claim that the Court should not consider UNRWA as a subsidiary organ because UNRWA raises its own money and is not funded by U.N. general revenues, Pl. Resp. Ltr. I at 14, Brewer Decl. Ex. F at 1.34, ECF No. 24-6; does not take policy direction from the General Assembly or Secretary-General but relies on its own advisory commission, Pl. Resp. Ltr. I at 15, Brewer Decl. Ex. E ¶ 8, ECF No. 24-4; its staff does "not participate in the same pay and benefits system as the personnel of the U.N. itself," Pl. Resp. Ltr. I at 15–16, Brewer Decl. Ex. I at ¶ 28, ECF No. 24-9; and "[f]unctionally, UNRWA's work looks nothing like that of the [U.N.]'s 'principal organs' such as the General Assembly and Security Council," Pl. Resp. Ltr. I at 16.

Defendants are correct that UNRWA is a subsidiary organ of the [U.N.], and Plaintiffs do not affirmatively demonstrate otherwise.

First, in light of the other evidence in the record, Plaintiffs' argument regarding the history of the formation of the CPIUN is not persuasive. The fact that the 1949 General Assembly resolution creating UNRWA asks world governments to grant UNRWA immunity is not tantamount to a declaration that UNRWA is not a subsidiary organ of the General Assembly, especially given that, in subsequent resolutions, the General Assembly has so designated UNRWA. *See* Mem. at 12–13; Reply at 4–5; *see also* G.A. Res. 6/513 ¶ 3 (Jan. 26, 1952) (stating UNRWA is a "subsidiary organ established by the General Assembly"); G.A. Res. 13/1315 (Dec. 12, 1958) ("Recalling that the Agency is a subsidiary organ of the United

Nations."). Moreover, the United States did not ratify CPISA because the immunity CPISA would have granted was duplicative of the immunity that IOIA granted to international organizations; CPIUN, however, "expanded IOIA immunity." *See Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 719 (D.C. Cir. 2022) ("[T]he Senate Report indicates that the political branches had not ratified treaties like the CPISA because they thought that the IOIA itself provided sufficient immunity to international organizations.")

Second, Plaintiffs' argument with respect to the U.N. organization chart and the U.N. website is equally unpersuasive. The chart explicitly notes its limitations, stating that it "is a reflection of the functional organization of the United Nations System and for informational purposes only" and "does not include all offices or entities of the United Nations System." *See* Brewer Decl. Ex. D. The March 2025 version of the chart explains that "[t]he relevant rules of the organization concerned should be consulted in order to establish the legal status, functions and reporting lines of each entity shown in [the] [c]hart," and includes UNRWA as a subsidiary organ of the General Assembly by grouping all previous entities of the General Assembly that were present in the July 2023 chart under one encompassing category of "Subsidiary Organs." *See* The United Nations System, Mar. 2025, available at https://www.un.org/en/delegate/page/un-system-chart. Additionally, the Second Circuit has held that the officials of another subsidiary organ listed in the "Other Entities" category of the chart, specifically, the UNHCR, are immune from suit under the CPIUN. *See Brzak*, 597 F.3d at 110; *see also* Def. Resp. Ltr. at 15, ECF No. 62; Def. Reply Ltr. at 7, ECF No. 68. Moreover, there is no basis to conclude that the roster of subsidiary organs listed on the U.N. website is exhaustive, considering differing evidence in the record of the General Assembly, *see, e.g.*, G.A. Res. 6/513 ¶ 3 (Jan. 26, 1952) (calling UNRWA a "subsidiary organ established by the General Assembly").

Third, the Court rejects Plaintiffs' interpretation of the General Assembly resolutions. *See* Pl. Sur-Reply at 7 n.6, ECF No. 42. These resolutions are either irrelevant to UNRWA's status as a subsidiary organ or constitute further evidence that it is. Mem. at 12–13. The resolutions do not relate to UNRWA at all, *see, e.g.*, G.A. Res. 78/78 (Nov. 16, 2023) (concerning "Israeli practices and settlement activities affecting the rights of the Palestinian people and other Arabs of the occupied territories," and nowhere mentioning UNRWA); relate to extending UNRWA's mandate and are silent on the status of UNRWA's immunity, *see, e.g.*, G.A. Res. 19/2002 (Feb. 10, 1965); G.A. Res. 35/13 (Nov. 3, 1980); or "call upon Israel to abide by Article[] . . . 105 of the [U.N.] Charter . . .with regard to" UNRWA, *see, e.g.*, G.A. Res. 50/28 (Dec. 6, 1995); *see also* U.N. Charter art. 105 ("The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes."). Moreover, the resolutions that Defendants cite (discussed *supra*), along with the legal opinion from the U.N. Office of Legal Affairs, expressly describe UNRWA as a subsidiary organ of the General Assembly and invoke its immunity under the CPIUN. *See* Mem. at 12–13; *see also Memorandum to the Legal Adviser, United Nations Relief and Works Agency for Palestine Refugees in the Near East*, 1984 U.N. Jurid. Y.B. 157, 188–89, U.N. Doc. ST/LEG/SER.C/22 (noting that UNRWA is "absolutely immune" from legal process under the CPIUN).

Fourth, the Court also rejects Plaintiffs' argument that UNRWA should be considered a specialized agency or analogous to a specialized agency. *See* Pl. Resp. Ltr. II at 12–13. UNRWA was established by the General Assembly under G.A. Res. 4/302 (IV) (Dec. 8, 1949) pursuant to the General Assembly's powers under Article 22 of the U.N. Charter; it was not created by "inter-governmental agreement" and "brought into relationship with the United

Nations in accordance with the provisions of Article 63"—the process that creates specialized agencies. U.N. Charter art. 57, ¶ 1.

Plaintiffs point to the Yearbook, which is published by the Codification Division of the General Assembly's Office of Legal Affairs, Ex. T, to argue that the U.N. considers UNRWA to be analogous to a specialized agency. Pl. Resp. Ltr. II at 12–13. Specifically, according to Plaintiffs, UNRWA cannot be characterized as a subsidiary body because the Yearbook: (1) states that UNRWA has been referred to internally as part of a group of "affiliated bodies;" (2) inconsistently and interchangeably uses the term subsidiary organs as it refers to various agencies; (3) states that entities like UNRWA are unlike other subsidiary organs because they "enjoy a considerable degree of autonomy," "have substantial operational independence" as well as independence "in financial matters since most of them are financed through voluntary contributions," and that "their activities closely resemble those of specialized agencies;" and (4) notes that "because of their special nature these subsidiary bodies" such as UNRWA "have always been treated differently within the [U.N.]." Pl. Resp. Ltr. II at 12–13; Yearbook at 354–58. Plaintiffs' interpretation of the Yearbook entries is incorrect. The Yearbook, in answering a question about why a report authored by the U.N.'s Joint Inspection Unit ("JIU") calls certain organizations, including UNRWA, "affiliated bodies," states that the Office of Legal Affairs "do[es] not have any information in [its] files as to why JIU in its reports uses the term 'United Nations affiliated bodies' with reference to entities which are 'subsidiary bodies of the United Nations." Yearbook at 355–356. The Yearbook explains that any "affiliated body" that the JIU report mentions, with the exception of the World Food Programme, is a "subsidiary bod[y] of the United Nations." *Id.* at 356. It notes that although certain subsidiary organs of the U.N., like UNRWA, enjoy a considerable amount of autonomy, "these subsidiary bodies are still not

completely independent, since their parent organ or organs can always change their structure or even terminate their activities." *Id.* at 357. Further, the Yearbook clarifies the JIU report's designation of UNRWA, and other subsidiary organs which have substantial operational autonomy, as "affiliated bod[ies]," by recommending that, instead, such subsidiary organs should be called "United Nations programmes, funds and offices." *Id.* Finally, the document does not say that subsidiary organs, which enjoy substantial operational autonomy, should not be immune from suit.[2] For that same reason, the Court rejects Plaintiffs' contention that UNRWA's operational structure should abrogate its absolute immunity under CPIUN.

Accordingly, the Court finds that UNRWA is a subsidiary organ of the U.N. and concludes, based on the "plain and unambiguous text of the CPIUN," *Sadikoglu*, 2011 WL 4953994, at *3, that UNRWA enjoys absolute immunity.

4. Government Statements of Interest

Although the Government has submitted two opposing sets of letters of interest, the Court need not consider the Government's changed position on UNRWA's immunity where the "plain and unambiguous text of the CPIUN grants the U.N. [and its subsidiary organs] absolute immunity." *Sadikoglu*, 2011 WL 4953994, at *3.

Both parties correctly recognize that the Court is not obligated to afford controlling authority to the Government's statement of interest, even if the Court ordinarily gives the Government's reasonable interpretations significant weight. They instead ask the Court to accord no deference to the Government's statements. *See* Opp. at 15–16; Pl. Resp. Ltr. II at 7; Def. Resp. Ltr. at 3–4. Also, Plaintiffs argued, before the filing of the Government's second

[2] The Court declines to consider Plaintiffs' other arguments that the Court should find CPIUN immunity does not extend to U.N.-affiliated bodies, Pl. Resp. Ltr. II at 15–16, because, as stated above, the Court finds that UNRWA is a subsidiary organ with immunity under the CPIUN.

letter, that the Government is "certainly entitled to no deference when its current litigation position contradicts its earlier positions," referencing statements made by the Senate when the CPIUN was being ratified. Opp. at 15.

"Courts have assigned varying weight to statements of interest by the United States Government according to the circumstances." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882, 2005 WL 2082846, at *3 (S.D.N.Y. Aug. 30, 2005). A question of interpretation, for example, involving "statutory or treaty interpretation, is a matter 'well within the province of the Judiciary. . . [and the Government's statements of interest] 'merit no special deference.'" *Freund v. Republic of France*, 592 F. Supp. 2d 540, 567 (S.D.N.Y. 2008), *aff'd sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939 (2d Cir. 2010) (citing *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004)). Because the text of the CPIUN unambiguously grants immunity to UNRWA as a subsidiary organ of the U.N., and, as explained below, to the Individual Defendants, the Court need not assign controlling weight to the Government's letters of interest.

B. *Jus Cogens* Waiver

Plaintiffs and StandWithUs amici contend that even if immunity were accorded to UNRWA under the CPIUN, no immunity can be provided for violations of *jus cogens* norms, or "peremptory norms of international law which enjoy the highest status in international law and prevail over both customary international law and treaties." *Devi*, 861 F. Supp. 2d at 142 (citation omitted); *see also* Pl. Resp. Ltr. I at 16; Opp. at 12–14; StandWithUs Br. at 6–9. These norms prohibit violations of human rights norms, including, for example, genocide, torture, prolonged arbitrary detention, and a consistent pattern of gross violations of internationally recognized human rights. Restatement (Third) of Foreign Relations Law § 702, cmt. n (1987)

("[A]n international agreement that violates [*jus cogens* norms] is void."). Plaintiffs argue that because Defendants have allegedly violated *jus cognes* norms "by aiding and abetting Hamas," no immunity should extend to UNRWA. Pl. Resp. Ltr. I at 17–19; Opp. 13–14.

The plain text of the CPIUN indicates that the U.N. and its subsidiary organs enjoy absolute immunity from suit unless expressly waived. *See* CPIUN, art. II, § 2; art. IV, § 11. The CPIUN does not provide for any implied waiver exception to UNRWA's absolute immunity, including a *jus cogens* implied waiver. Where the U.N. has not expressly waived its immunity, which it has not done here, *see generally* U.N. Ltr. I; U.N. Ltr. II, this Court will not read in a waiver of immunity; the Second Circuit has explained that doing so "would read the word 'expressly' out of the CPIUN." *Brzak*, 597 F.3d at 112 (refusing to imply waiver of immunity from Plaintiffs' arguments that "purported inadequacies with the United Nations' internal dispute resolution mechanism indicate[d] a waiver of immunity," because the U.N. "ha[d] not waived its immunity"); *see also Sadikoglu*, 2011 WL 4953994, at *3 ("The plain and unambiguous text of the CPIUN grants the U.N. absolute immunity 'from every form of legal process' unless it has so waived. Accordingly, because . . . a subsidiary program of the U.N. that reports directly to the General Assembly . . . has not waived its immunity, 'the CPIUN mandates dismissal of Plaintiff[s'] claims against the United Nations for lack of subject matter jurisdiction.'" (cleaned up)).

Additionally, as discussed below, the Second Circuit has rejected the contention that a *jus cogens* theory of implied waiver can apply to the FSIA, which applies to international organizations through the IOIA and provides a narrower grant of immunity as compared to the CPIUN.

C. The Foreign Sovereign Immunities Act and International Organizations Immunities Act

Defendants argue that UNRWA is also afforded immunity under the IOIA because, in 1946, President Harry Truman designated the U.N. as an international organization under the IOIA, and UNRWA, as a subsidiary organ, is entitled to that same immunity. Mem. at 16–17. Defendants maintain, however, that any immunity afforded under the CPIUN is given "without regard for whatever immunities may be conferred under the IOIA." *Id.* at 17. Plaintiffs contend that because UNRWA has not been specifically designated by the President by Executive Order, it is not entitled to immunity under the statute. Opp. at 10; Pl. Sur-Reply at 5–7, ECF No. 42; Pl. Resp. Ltr. II at 8–10. Plaintiffs further argue that the implicit waiver and commercial activity statutory exceptions to immunity, under 28 U.S.C. § 1605(a)(1)–(2), and a *jus cogens* violation exception to immunity, should also apply to any immunity under the IOIA. Pl. Sur-Reply at 2–5.

The FSIA, 28 U.S.C. § 1602 *et seq.*, establishes that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" subject to the statute's exceptions to such immunity. *Id.* § 1604. It is the "only source of subject matter jurisdiction over a foreign sovereign or its instrumentalities in the courts of the United States." *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83 (2d Cir. 2013); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The IOIA grants international organizations expressly designated by the President of the United States "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by terms of any contract." 22 U.S.C. § 288a(b). "Today, that means that the [FSIA] governs the immunity of international organizations." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 215 (2019). President Truman designated the U.N. as an international organization

subject to the IOIA in 1946. *See* Exec. Order No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946).[3] Under the FSIA, "once a defendant presents a *prima facie* case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Blue Ridge*, 735 F.3d at 83 (internal quotation marks omitted). "[T]he ultimate burden of persuasion remains with the alleged foreign sovereign." *Id.*

Because the Court has already determined UNRWA enjoys immunity under the CPIUN, it need not address here whether UNRWA has immunity under the IOIA. "[W]hatever immunities are possessed by other international organizations," including under the IOIA, "the CPIUN unequivocally grants the [U.N.] absolute immunity without exception." *Brzak*, 597 F.3d at 112. "[T]he privileges and immunities accorded by the IOIA are only default rules," and so "the organization's charter can always specify a different level of immunity. The charters of many international organizations do just that." *Jam*, 586 U.S. 199, 214 (2019) (citing CPIUN, Art. II § 2). "[T]o the extent there exists any conflict between the CPIUN and the FSIA as it relates to [a subsidiary body of the U.N.'s] immunity, the CPIUN would control." *Sadikoglu*, 2011 WL 4953994, at *5 (finding that the United Nations Development Programme is immune from suit as a subsidiary body of the U.N.).

Further, the Court need not address Plaintiffs' arguments about the implicit or commercial activity FSIA statutory exceptions as they relate to UNRWA because they are otherwise irrelevant to UNRWA's immunity under the CPIUN. *See e.g.*, *Sadikoglu,* 2011 WL 4953994, at *4 (finding a subsidiary organ "enjoys absolute immunity from the present suit

[3] In its second statement of interest, the Government notes that on February 4, 2025, President Donald Trump withdrew United States funding from UNRWA and argues that the Court should view this withdrawal as an abrogation of UNRWA's immunity under the IOIA. *See* Govt. Ltr. II at 3 n.1; Exec. Order No. 14199, 90 Fed. Reg. 9275 (Feb. 4, 2025). Because the Court finds UNRWA immune from suit under the CPIUN, it makes no finding as to whether this withdrawal of funding constitutes an abrogation of any immunity UNRWA is afforded under the IOIA.

notwithstanding plaintiff's contention that [the] FSIA, as applied to international organizations through the IOIA, denies [that organ] immunity for disputes arising out of private commercial transactions"). Further, "there is no general *jus cogens* exception to FSIA immunity." *Carpenter v. Republic of Chile*, 610 F.3d 776, 779 (2d Cir. 2010) (per curiam) (citing *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009)).

Accordingly, because UNRWA is immune under the CPIUN and has not waived that immunity, its immunity stands, and the Court need not address alternative grants of immunity to UNRWA under the IOIA, "which grants international organizations the 'same immunity' from suit 'as is enjoyed by foreign governments' under the FOIA," *see Jam*, 586 U.S. at 215 (citation omitted).

III. Individual Defendants' Immunity

The Individual Defendants also argue that they are immune from suit. Specifically, Lazzarini and Grandi claim they each currently hold the rank of U.N. Under-Secretary-General, and that they, therefore, should be accorded diplomatic immunity, under the CPIUN and the Vienna Convention on Diplomatic Relations ("VCDR"), because immunity has not been waived. Mem. at 19–21. All Individual Defendants contend that they are entitled to immunity under the CPIUN and IOIA, as current and former U.N. officials being sued for acts alleged to have been committed in their official capacity, and that they have not waived that immunity. Mem. at 21–29. Plaintiffs argue that none of the Individual Defendants are entitled to immunity because UNRWA is "not the same entity as the [U.N.] itself," and any immunity has been waived through a *jus cogens* exception or through statutory exceptions under the FSIA. Pl. Resp. Ltr. I at 20–26; Opp. 19–27.

A. Legal Standard

Under the Diplomatic Relations Act of 1978, 22 U.S.C. § 254a *et seq.*, "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the [VCDR] . . . or under any other laws extending diplomatic privileges and immunities, shall be dismissed." 22 U.S.C. § 254d. This includes immunity granted under the CPIUN. *Brzak*, 597 F.3d at 113 (citing 22 U.S.C. § 254d).

Under the VCDR, "[a] diplomatic agent shall enjoy immunity from . . . civil and administrative jurisdiction." VCDR art. 31. The VCDR provides three exceptions to this immunity: where the action relates to (1) "private immovable property;" (2) succession, where the diplomat is an executor; and (3) professional or commercial activity exercised by the diplomatic agent "in the receiving State outside of his official functions." *Id.* art. 31 ¶ 1(a)–(c). The VCDR extends immunity to former diplomats only "with respect to acts performed by such a person in the exercise of his functions" as a diplomat. *Id.* art. 39, ¶ 2.

Under the CPIUN, "[t]he Secretary-General and all Assistant Secretaries-General shall be accorded . . . the privileges and immunities . . . accorded to diplomatic envoys, in accordance with international law." CPIUN, art. V, § 19. U.N. officials are "immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity." *Id.* art. V, §§ 17–18. Because the CPIUN's immunity for U.N. officials is "in the interests of the [U.N.] and not for the personal benefit of the individuals themselves, . . . [t]he Secretary-General shall have the right and the duty to waive the immunity of any official in any case where, in his opinion, the immunity would impede the course of justice and can be waived without prejudice to the interests of the [U.N.]." *Id.* art. V, § 20. The immunity afforded to U.N. officials from the CPIUN and VCDR also applies to former U.N. officials for acts that were done within their

functions as diplomats. *See Brzak*, 597 F.3d at 113; *Van Aggelen v. United Nations*, 311 F. App'x 407, 409 (2d Cir. 2009).

Finally, the IOIA provides international organizations, including the U.N., the "same immunity from suit and every form of judicial process as is enjoyed by foreign governments." 22 U.S.C. § 288a(b); *Brzak*, 597 F.3d at 112; Exec. Order No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946). According to the FSIA, that is "immun[ity] from the jurisdiction of the courts of the United States and of the States" subject to the statute's exceptions to such immunity. 28 U.S.C. § 1604.

"When a court attempts to determine whether a defendant is seeking immunity 'with respect to acts performed by such a person in the exercise of his functions' . . . the court must do so without judging whether the underlying conduct actually occurred, or whether it was wrongful." *Brzak*, 597 F.3d at 113 (citing VCDR art. 39 ¶ 2). The Court, therefore, looks to the allegations in the complaint and determines whether those actions were alleged to have been "performed in exercise of their official functions." *Id*.

B. Burden of Proof

Who bears the burden of proving the Individual Defendants' immunity? Defendants argue, for the same reasons articulated with respect to UNRWA, that the burden lies with Plaintiffs. *See* Mem. at 7–8. Plaintiffs contend that Defendants must first make an initial showing of diplomatic immunity, and then the burden shifts to Plaintiffs to show that an exception to that immunity applies. Pl. Resp. Ltr. II at 5–6. As stated above, the FSIA contains a burden-shifting framework that requires the foreign sovereign to first make a *prima facie* showing of immunity. Under the VCDR, however, "[r]egardless of whether the burden-shifting approach is appropriate as applied to the FSIA, there is no justification for extending it to VCDR

immunity." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 444 (2d Cir. 2019). "Accordingly, where a defendant has demonstrated diplomatic status, . . . plaintiffs bear the burden of proving by a preponderance of the evidence that an exception to diplomatic immunity applies and that jurisdiction therefore exists." *Id.* That is, "Plaintiffs bear the burden of establishing jurisdiction." *Id.* As stated above, with regard to CPIUN immunity, Plaintiffs also bear the burden of proving that that immunity does not exist and that this Court has subject matter jurisdiction.

C. Defendants Lazzarini and Grandi

The Court agrees that because Lazzarini and Grandi both hold the rank of U.N. Under-Secretary-General, and held that rank for the time periods alleged in the complaint, they are entitled to diplomatic immunity under the CPIUN. *See* Compl. ¶¶ 508, 510; Mem. at 19–20; Reply at 7 n.5; U.N. Ltr. I at 3; *see also Kaambo v. Off. of U.S. Sec'y-Gen.*, No. 22 Civ. 9447, 2023 WL 2216254, at *2 (S.D.N.Y. Feb. 21, 2023) ("[S]enior executives of the [U.N.]—including the Secretary General of the [U.N.], Under Secretaries-General and Assistant Secretaries-General of the [U.N.]—enjoy full diplomatic immunity . . . .").

Lazzarini and Grandi are also immune under the VCDR because Plaintiffs' allegations concern acts effectuated only in their official capacities. *See* Compl. ¶ 515 ("Each of the Individual Defendants, during their respective time in UNRWA's senior management, directed, ratified, and/or otherwise facilitated the wrongful policies and actions of UNRWA complained of herein.").

Plaintiffs cannot meet their burden of showing that any of the exceptions to the VCDR apply to Lazzarini or Grandi because their conduct "was carried out in their 'professional'

capacity during their respective tenures directing UNRWA." Pl. Resp. Ltr. I at 26.[4] The commercial activity exception does not apply here. That exception permits a diplomat to be sued in "[a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." VCDR art. 31(1)(c); *see also Broidy*, 944 F.3d at 436. The exception "is broadly understood to refer to trade or business activity engaged in for personal profit." *Broidy*, 944 F.3d at 445. The complaint contains allegations relating to Lazzarini and Grandi's work "during their respective time in UNRWA's senior management," *see, e.g.*, Compl. ¶ 515, not allegations relating to commercial activity.

Plaintiffs ask the Court to find a *jus cogens* exception to immunity under either the CPIUN or VCDR with respect to Lazzarini and Grandi. *See* Pl. Resp. Ltr. I at 23–25; Pl. Sur-Reply at 9–10. As this Court has held in the CPIUN and VCDR context, "[n]o United States court has recognized a *jus cogens* exception to diplomatic immunity from its civil jurisdiction, and this Court declines to do so." *Devi*, 861 F. Supp. 2d at 142; *see also Rosenberg v. Pasha*, 577 F. App'x 22, 24 (2d Cir. 2014) (rejecting a *jus cogens* exception in the common law immunity context); *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (rejecting *jus cogens*

[4] Plaintiffs and AAF amici claim that the Individual Defendants, including Lazzarini and Grandi, are not actually Under-Secretaries-Generals or officials of the U.N., and the U.N. has failed to specify which categories of officials the Individual Defendants might fall under. *See* Pl. Resp. Ltr. I at 20, 26; Pl. Sur-Reply at 8–9; Pl. Resp. Ltr. II at 1920; AAF Br. at 7–8. Not so. The record, including allegations in the complaint, clearly supports the current and former rank and position claimed by the Individual Defendants. *See* Compl. ¶¶ 508–514; Govt. Ltr. I at 78; ECF No. 17-2 at 3; Govt Reply Ltr. I at 9; Reply at 7 n.5 (citing a United Nations webpage listing senior officials of the U.N., defined as "Under-Secretaries-General and Assistant Secretaries-General," which, as of its last update on Sept. 10, 2025, includes both Lazzarini and Grandi). Both Plaintiffs and AAF amici confuse Lazzarini and Grandi's titles (Commissioner-General of UNRWA and U.N. High Commissioner for Refugees, respectively) with their rank. *See* Reply at 7 n.5. Therefore, the Court rejects Plaintiffs' contention that the "U.S. has surrendered to the [U.N.] boundless and unreviewable discretion to dole out absolute immunity to [whomever] it wants, for whatever reasons it wants," Pl. Resp. Ltr. II at 20, but instead interprets binding international law in the CPIUN that lays out which categories of officials are entitled to immunity according to their function or rank. *See* CPIUN art. V, §§ 17–19.

exception in the FSIA and common law immunity context).[5] Accordingly, Defendants Lazzarini and Grandi are immune from suit under the CPIUN and VCDR.

D. Remaining Individual Defendants

The remaining Individual Defendants are also immune from suit under the CPIUN and VCDR because they are all current or former U.N. officials, and all of Plaintiffs' allegations about their conduct concern their official acts. *See* Compl. ¶¶ 509, 511–15; Mem. at 21. As it relates to immunity under the CPIUN, the Secretary-General has not waived the Individual Defendants' immunity. Mem. at 21. For the same reasons stated with respect to Lazzarini and Grandi, the VCDR commercial exception does not apply to the Individual Defendants because Plaintiffs' allegations address acts undertaken in their official roles. *See* Compl. ¶ 515. Indeed, Plaintiffs disclaim alleging any conduct for "certain Individual Defendants who are no longer affiliated with UNRWA" as it relates to "any act or omission following their departure from UNRWA's employment" and only allege facts as they relate to "their acts or omissions during their tenure with UNRWA." Compl. ¶ 516.

Plaintiffs also argue that two press releases should be construed to constitute a waiver of the Individual Defendants' immunity. In the first press release, issued by UNRWA and dated January 26, 2024, Lazzarini states that "[a]ny UNRWA employee who was involved in acts of

[5] Plaintiffs' reliance on *United States v. Bahel*, 662 F.3d 610 (2d. Cir. 2011) and *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012), to support their argument that a *jus cogens* exception should apply to the official-act immunity of the Individual Defendants is misplaced. First, in *Bahel*, the Second Circuit found that the Secretary-General "effectively and expressly waived [the defendant U.N.-official's] immunity" because the U.N. was made aware of the defendant's corruption, and the Secretary-General sent a letter to the U.S. Attorney's Office stating it had "waived, [u]nder Article V, Section 20 of the [CPIUN] immunity from legal process" for the defendant. *Id.* at 620-21, 26. No such facts exist here, and instead, the U.N. has expressly invoked the immunity of the Individual Defendants and UNRWA. *See generally* U.N. Ltr. I; U.N. Ltr. II; Defs. Imm. Ltr. Second, in *Yousuf*, when the Fourth Circuit found a *jus cogens* exception for official-act immunity, the basis for immunity was the FSIA, not the CPIUN, as it is here. *See* 699 F.3d at 766. The case Plaintiffs cite to argue that this Circuit "followed *Yousuf*," Opp. at 21, dealt with the court "declaring invalid . . . the act of a foreign sovereign" under the "act of state doctrine," not absolute immunity under the CPIUN or even statutory immunity under the FSIA, *see, e.g.*, *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019).

terror will be held accountable, including through criminal prosecution." *See* Brewer Decl. Ex. P at 2, ECF No. 24-16. A second press release, issued two days later by a spokesperson for the Secretary-General, summarizes the briefing given to Lazzarini on allegations implicating UNRWA staff in the October 7 Attack and directs him to investigate those allegations. *See* Brewer Decl. Ex. Q, ECF No. 24-17. Plaintiffs state that these press releases constitute a waiver of immunity because they were "not made causally or lightly" and were made "in the interests of UNRWA[]." Pl. Resp. Ltr. I at 24–25; Opp. at 23–25. Because any waiver of immunity for a U.N. official must be expressly made by the Secretary-General under the CPIUN, the Court declines to imply a waiver from these public statements, *cf. United States v. Bahel*, 662 F.3d 610, 625 (2d Cir. 2011), especially where the U.N. has expressly invoked the immunity of the Individual Defendants. *See* U.N. Ltr. I at 34; *see also* U.N. Ltr. II at 2; Def. Imm. Ltr. at 1; *see also LaVenture v. United Nations*, 746 F. App'x 80, 82 (2d Cir. 2018) (noting that mere use of the word "liability" in certain reports did not waive immunity, and refusing to imply a waiver from two Secretary-General reports because "[t]o the contrary, the [U.N.] has always maintained and continues to maintain its immunity from legal process in domestic courts")

Plaintiffs and AAF amici finally argue that a *jus cogens* exception should apply to any immunity afforded to the Individual Defendants. Pl. Resp. Ltr. I at 24–25; Opp. at 21–23; AAF Br. at 10–25 (arguing in the alternative that Individual Defendants' conduct should be considered under an *ultra vires* theory). As stated above, because there is no recognized *jus cogens* exception to diplomatic immunity, the Court cannot find one here. For the same reasons, the Court rejects the argument that an implied *ultra vires* exception to the CPIUN or VCDR immunity applies to this case.

Accordingly, because the alleged conduct only concerns acts carried out in their official capacity and there has been no waiver of immunity, and no applicable exception applies, the Court finds that all Individual Defendants are immune from suit under the VCDR and CPIUN and need not address whether they are also immune under the IOIA.

**CONCLUSION**[6]

Because UNRWA is a subsidiary organ of the United Nations and has not waived its immunity, it is entitled to immunity under the CPIUN. The Individual Defendants, including Defendants Lazzarini and Grandi, are likewise protected by diplomatic immunity for actions taken in their official capacities under the CPIUN and VCDR. Accordingly, this Court lacks subject matter jurisdiction over Plaintiffs' claims. Defendants' motion to dismiss is GRANTED, and the complaint DISMISSED with prejudice. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: September 30, 2025
New York, New York

ANALISA TORRES
United States District Judge

[6] Defendants also argue that this case should be dismissed for lack of personal jurisdiction over certain Defendants. Mem. at 29. Because the Court has concluded that there is no subject matter jurisdiction, it need not address arguments regarding personal jurisdiction. *See Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 12 (2d Cir. 1989). Plaintiffs' request for jurisdictional discovery, *see* Opp. at 27–28, is also denied because Plaintiffs have failed to make out a *prima facie* case for jurisdiction. *Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Rep.*, 582 F.3d 393, 401–02 (2d Cir. 2009).

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

ESTATE OF TAMAR KEDEM SIMAN TOV, BY HEIR-AT-LAW GAD KEDEM, ESTATE OF 0. S. T., BY HEIR-AT-LAW GAD KEDEM, GAD KEDEM, INDIVIDUALLY, REUMA KEDEM, TALIA BINER, ESTHER BINER, DITZA HEIMAN, NETA HEIMAN MINA, DAFNA SHAY HEIMAN, GIDEON HEIMAN GLATT, YASMIN BEN GIGI, MAA YAN ELIAZ, INDIVIDUALLY, ESTATE OF DIKLA ARA VA ELIAZ, BY HEIR-AT-LAWS ODIN ELIAZ AND STAV ELIAZ, ESTATE OF T.E., MINOR CHILD, BY HEIR-AT-LAW MAA YAN ELIAZ, ODIN ELIAZ, INDIVIDUALLY, STAV ARAVA ELIAZ, INDIVIDUALLY, DOV ELIAZ, YIFAT TANAMI, SAGI ARA VA, ALON ARA VA, HADAR BEN DAVID, LIAT KOPERSTEIN, Y ALI KOPERSTEIN, ZIV KOPERSTEIN, NAAMA KOPERSTEIN, GONI KOPERSTEIN A VNI, RAN AHARON A VNI, MAA YAN ZIN, INDIVIDUALLY, D.E., MINOR CHILD, BY LEGAL GUARDIAN MAA YAN ZIN, E.E., MINOR CHILD, BY LEGAL GUARDIAN MAA YAN ZIN, MERA V TAL (T AL ALF ASI), RACHEL ALFENDRI, TOMER TAL ALF ASI, ORI TAL ALF ASI, KEREN BLANK, SIGALIT SHARABI, VIKTOR RAHMILOV, GALINA RAHMILOV, INDIVIDUALLY, SOFIA HODEDATOV, SIGAL BENBENISTE, NATALI RAHMILOV, E.L.R, MINOR CHILD, BY LEGAL GUARDIAN GALINA RAHMILOV, TAMIR HODEDATOV, HANANEL BENBENISTE, EFIM SOLOMONOV, ESTATE OF YUV AL BAR-ON, BY HEIRS-AT-LAW ORIT BAR-ON AND ITZHAK BAR-ON, ORIT BAR-ON, INDIVIDUALLY, ITZHAK BAR-ON, INDIVIDUALLY, ESTATE OF MOSHE SHUV A, BY HEIR-AT-LAW YOSSEF SHUV A, YOSSEF SHUV A, INDIVIDUALLY, SONIA SHUV A, MAA YAN DEVIKO, SHIMON SHUV A, ESTATE OF DROR KAPLUN, BY HEIRS-AT-LAW NOAM KAPLUN, MAAYAN KAPLUN KEIDAR, MORAN KAPLUN (TARASOV), NOAM KAPLUN, INDIVIDUALLY, MAAYAN KAPLUN KEIDAR, INDIVIDUALLY, MORAN KAPLUN (TARASOV), INDIVIDUALLY, ESTATE OF MARCEL FRAILICH, BY HEIRS-AT-

LAW MOR FRIDA STRIKOVKI, ZIV FRAILICH, AMIT FRAILICH, MOR FRIDA STRIKOVSKI, INDIVIDUALLY, ZIV FRAILICH, INDIVIDUALLY, AMIT FRAILICH, INDIVIDUALLY, SHARON CASPI, AMIT CASPI, INDIVIDUALLY, NIV CASPI, MAY CASPI, S. C., MINOR CHILD, BY LEGAL GUARDIAN AMIT CASPI, ESTATE OF VARDA HARAMATY, BY HEIR-AT-LAW AYELET HARAMATI MIZRAHI, AYELET HARAMATI MIZRAHI, INDIVIDUALLY, AVRAHAM MIZRAHI, ITAMAR MIZRAHI, TOMER MIZRAHI, EDITH HYAMS, ASHER SABAG, MICHAL SABAG, DOR MICHAEL SABAG, DANNY OFER VAGE, INDIVIDUALLY, GAT VAGE, H. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, S. V., MINOR CHILD, BY LEGAL GUARDIAN DANNY OFER VAGE, ESTATE OF MARK SHINDEL, BY HEIR-AT-LAW JULIA SHINDEL, JULIA SHINDEL, INDIVIDUALLY, IGOR SHINDEL, GUY SHINDEL, B. S., MINOR CHILD, BY LEGAL GUARDIAN JULIA SHINDEL, ESTATE OF YUVAL SALOMON, BY HEIR-AT-LAW DORON SALOMON, DORON SALOMON, INDIVIDUALLY, ESTATE OF GAYA HALIFA, BY HEIR-AT-LAW AVRAHAM HALIFA, AVRAHAM HALIFA, INDIVIDUALLY, SIGAL HALIFA, NOGA HALIFA, IDO HALIFA, IRIT LAHAV, TAMAR LAHAV, ELIYAHU HANAN BUCH, NITZAN LAHAV-PASTER, YAARA SZATMARI, ILAN LAHAV, GALIT LAHAV, INDIVIDUALLY, GUI LAHAV, R. L., MINOR CHILD, BY LEGAL GUARDIAN GALIT LAHAV, AND OMER LAHAV,

Plaintiffs,

-against-

24 **CIVIL** 4765 (AT)

**<u>JUDGMENT</u>**

UNITED NATIONS RELIEF AND WORKS AGENCY (“UNRWA”), PHILIPPE LAZZARINI, PIERRE KRÄHENBÜHL, FILIPPO GRANDI, LENI STENSETH, SANDRA MITCHELL, MARGOT ELLIS, AND GRETA GUNNARSDOTTIR,

Defendants.

-----------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated September 30, 2025, this Court lacks subject matter jurisdiction over Plaintiffs' claims. Defendants' motion to dismiss is GRANTED, and the complaint DISMISSED with prejudice; accordingly, the case is closed.

**Dated:** New York, New York
September 30, 2025

**TAMMI M. HELLWIG**

**Clerk of Court**

**BY:** [signature]

**Deputy Clerk**